

# NUMBER 13-19-00111-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE SOUTHWESTERN PUBLIC SERVICE COMPANY, XCEL ENERGY, INC., AND XCEL ENERGY SERVICES, INC.

## On Petition for Writ of Mandamus.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Hinojosa Memorandum Opinion by Justice Benavides[1]**

By petition for writ of mandamus, relators Southwestern Public Service Company (SPS), Xcel Energy Inc., and Xcel Energy Service Inc., seek to set aside (1) an order denying their motion to recuse the judge of the trial court, and (2) an order granting death penalty sanctions against relators.[2] We deny the petition for writ of mandamus regarding

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so. When granting relief, the court must hand down an opinion as in any other case."); *see also id.* R. 47.4 (distinguishing opinions and memorandum opinions).

[2] This original proceeding arises from trial court cause number C-4964-16-1 in the 398th District Court in Hidalgo County, Texas. Relators seek mandamus relief against the judge of that court, the Honorable Keno Vasquez, who issued the death penalty sanction order against relators, and the Honorable

recusal and conditionally grant the petition for writ of mandamus regarding the imposition of death penalty sanctions.

## I.    BACKGROUND

On October 26, 2016, Eduardo Munoz Jr. suffered severe personal injuries, including burns and permanent spinal cord injuries resulting in paralysis, from an electrical arc arising from a high voltage power line that was owned and operated by relators. Munoz had loaded a tractor-trailer rig with peanuts near the power line and was attempting to cover his load with a tarp when the accident occurred. The parties to this original proceeding offer different scenarios regarding the factual basis for the accident and its cause. However, the basic underpinnings of the incident are as follows, and additional facts will be discussed in connection with the specific issues raised in this original proceeding.

Wilco Peanut Co., Ltd. (Wilco) hired Munoz to pick up peanuts and deliver them to its peanut processing facility. Marco Sustayta, a Wilco employee, dispatched Munoz to retrieve peanuts from a peanut farm owned or operated by Dustin Nelson. Nelson's peanut farm utilized a conveyer belt, with a loading area beneath the conveyer belt, for trucks to use in loading the peanuts. The conveyer belt was positioned either underneath or near the power line operated by relators. After loading the peanuts into his trailer, Munoz had difficulty in covering his load with a tarp. Munoz's trailer was equipped with a crank rod which allowed the tarp to be rolled over the load; however, the tarp failed to unroll across the peanuts. Munoz climbed on top of the trailer to attempt to manually roll the tarp, and during his efforts, the metal crank arm which rolled the tarp either came in

Missy Medary, the Presiding Judge of the Fifth Administrative Judicial Region, who denied relators' motion to recuse Judge Vasquez. *See id.* R. 52.2.

2

contact with or came into extreme proximity to the power line, thereby creating the electrical arc that caused Munoz's injuries. The day after the accident, relators investigated the incident with a team of ten employees who measured the height of the power line at the point of contact at 25.38 feet high.

Plaintiffs[3] brought suit against Wilco, Sustayta, Nelson, and relators. The defendants other than relators have settled their claims with the plaintiffs and are not parties to this original proceeding. At the beginning of the lawsuit, the plaintiffs alleged a general negligence claim against relators.[4] In their third amended petition filed on October 1, 2018, the live pleading at the time the orders subject to review were signed, the plaintiffs alleged that relators were negligent and grossly negligent in: transmitting excessive current on the subject power line causing it to sag dangerously; failing to timely de-energize the power line to prevent it from excessively sagging; violating Texas Utilities Code §§ 38.004, 181.045, "and/or similar statutes," by failing to operate and/or maintain the power line in accordance with the minimum ground clearance required by the National Electric Safety Code (NESC), that is, negligence per se; failing to maintain the height of the power line in accordance with the NESC, Part 2, § 23; failing to properly monitor the height of the power line; negligently operating and monitoring the electrical power transmission and communication systems; and failing to properly inspect the height of the

---

[3] The plaintiffs include Eduardo Munoz Jr. and Kasandra Girela Munoz, individually and as next friend to their minor child.

[4] In their Original Petition, filed in this case on November 1, 2016, the plaintiffs alleged that SPS was negligent. In their First Amended Petition, filed on February 27, 2017, the plaintiffs alleged that relators were negligent, negligent per se, and grossly negligent. At least based on the record, plaintiffs did not request service of citation on relators until April 5, 2017. Relators filed their motion to transfer venue and answer on May 8, 2017. Plaintiffs' Second Amended Petition, filed on July 5, 2017, specified that relators were negligent and grossly negligent in failing to maintain, monitor, and inspect the height of the power line.

power line. The plaintiffs also invoked the doctrine of res ipsa loquitur, pleading that "the character of the subject event is such that it would not ordinarily occur in the absence of negligence, and that the subject power line was under the management and control of [relators] at the time of the occurrence." The plaintiffs sought compensatory damages in the aggregate sum of $245,000,000.

In contrast, the relators asserted that their power line was properly maintained and operated, that the power line was maintained at an appropriate height, and that there were no overcurrent events or faults which would have caused the power line to sag. They asserted that Munoz climbed on top of the peanut trailer and physically lifted the tarp rod into contact with the power line, or otherwise brought the tarp rod into such close proximity to the power line that an electrical contact occurred. The relators further contended that, though the Texas Health and Safety Code required that they be notified if anyone planned to work near the power line, they did not receive any such required notification. The relators further filed a counterclaim against the plaintiffs and cross-claims against Wilco, Sustayta, and Nelson for indemnity.

Early in the case, the defendants in the lawsuit sought to transfer venue from Hidalgo County, Texas, to Yoakum County, Texas. In response, the plaintiffs requested that the trial court grant "emergency relief" allowing extensive discovery regarding the venue facts underlying the case. On June 27, 2017, the trial court signed an Emergency Discovery Order at the plaintiffs' behest. This order is not limited in scope to discovery regarding venue but extends to substantive discovery on the merits. The Emergency Discovery Order, which is twenty-four pages long, included industry definitions, ordered the relators to designate Rule 199.2 corporate representatives to testify about twenty-

4

seven topics, and required the production of fifty-seven categories of documents. *See* TEX. R. CIV. P. 199.2. The Emergency Discovery Order provided, inter alia, that the plaintiffs' depositions were to take place after all of the defendants' depositions had been taken. After entry of this order, the plaintiffs thereafter propounded requests for production and interrogatories to relators requesting the same and similar information as designated in the Emergency Discovery Order.

On July 10, 2017, the plaintiffs filed a Motion to Compel Disclosures, Motion for Order Shortening Time to Answer Interrogatories, and Motion for Rule 215 Sanctions. The plaintiffs alleged that the relators had not responded to the plaintiffs' requests for disclosure which had been due between June 1 and June 6, 2017. The plaintiffs further alleged that relators had violated the Emergency Discovery Order by noticing Munoz's deposition even though the relators' witnesses had not yet been deposed. The plaintiffs asked the trial court to shorten the time for relators to respond to interrogatories and to impose sanctions because of the relators' "bad faith conduct" and "discovery abuse." On July 25, 2017, the trial court granted the plaintiffs' motion, in part, and ordered relators to provide responses to requests for disclosure and answer interrogatories by July 28, 2017.

The parties continued to engage in a series of protracted and rancorous discovery disputes. Of relevance here, on June 13, 2018, the plaintiffs filed a Motion to Compel Deposition of Maria Vasquez and Motion for Rule 215 Sanctions. The plaintiffs alleged that, although the Emergency Discovery Order required relators to produce witnesses "with the best knowledge" of various topics, which included "all aspects of the investigation of the incident," relators produced only Cory Wood, who worked in the construction department and did not participate in the accident investigation, and not

5

Vasquez, who actually handled the accident investigation and interviewed the witnesses to the incident. On July 27, 2018, the trial court entered an Order Compelling Deposition of Maria Vasquez and also entered an Order Granting Plaintiffs' Motion to Compel Deposition of Maria Vasquez and Motion for Rule 215 Sanctions against relators. The July 27, 2018 sanction order concludes that relators violated the June 27, 2017 Emergency Discovery Order and various rules of civil procedure by: (1) producing only one corporate representative, Wood, to testify about twenty-seven different topics, because he lacked relevant knowledge, was evasive, and was unprepared for the deposition; and (2) failing to produce Vasquez for deposition, even though she was the claims investigator who examined the scene immediately after the accident. The trial court concluded that relators' alleged discovery abuse hindered and obstructed the plaintiffs' prosecution of their lawsuit. The trial court ordered relators to:

> [D]esignate as many individuals as necessary to testify on their behalf regarding all aspects of the investigation of the [relators regarding] the incident made the basis of suit, and the [relators] shall fully prepare all such individuals as to all matters that are known or reasonably available to the [relators] in accordance with TEX. R. CIV. P. 199.2(b)(1) and this Court's order of June 27, 2017.

The trial court ordered relators to pay: (1) "all court reporter and videographer fees and costs in connection with the deposition of the corporate representative witness(es)," (2) "monetary sanctions for the preparation and prosecution of this Motion in the amount of hotel, air flight, rental car & meals" to plaintiffs' counsel, (3) "travel and lodging costs incurred to attend the hearing of this motion" to plaintiffs' counsel, and (4) "monetary sanctions for the preparation and prosecution of the Joinder in Plaintiffs' Motion to Compel Oral Deposition of Maria Vasquez and Motion for Sanctions, filed by [Wilco] in the amount of hotel, air flight, rental car & meals," to counsel for Wilco.

6

On February 28, 2018, SPS moved for partial summary judgment on its pending cross-claims against Sustayta, Wilco, and Nelson. SPS argued that Sustayta, Wilco, and Nelson were each liable to SPS for indemnity pursuant to provisions of the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 752.001–.008. Chapter 752 of the Texas Health and Safety Code pertains to persons engaged in activities near high voltage power lines. *See id.*; *McCaughtry v. Barwood Homes Ass'n*, 981 S.W.2d 325, 334 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *Martinez v. Gulf States Util. Co.*, 86 S.W.2d 802, 804 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Section 752.003 requires persons responsible for temporary work or activities within certain prescribed proximities to high voltage overhead lines to notify the operator at least forty-eight hours before any work begins and to arrange for de-energization of the lines or the implementation of other safety precautions. *See* TEX. HEALTH & SAFETY CODE ANN. § 752.003(a)–(b). Section 752.004 restricts activities "within six feet" of a high voltage line unless a person first complies with § 752.003. *See id.* § 752.004. When a person or entity fails to comply with Chapter 752, and physical or electrical contact with high voltage overhead lines results, the person or entity who committed the violation is liable "for all liability that the owner or operator incurs as a result of the contact." *Id.* § 752.008; *see Trail v. Friedrich*, 77 S.W.3d 508, 513–14 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (holding that a plaintiff who violates Chapter 752 cannot recover damages from the line owner because, under § 752.008, the plaintiff must indemnify the line owner for his or her own damages). The purpose of the indemnification provision, § 752.008, is to place liability for losses resulting from noncompliance with the statute's notification and safety provisions on the person responsible for having workers near a power line. *See*

7

*Chavez v. City of San Antonio ex rel. City Pub. Serv. Bd. of San Antonio*, 21 S.W.3d 435, 439 (Tex. App.—San Antonio 2000, pet. denied); *Martinez*, 864 S.W.2d at 805.

SPS's motion for partial summary judgment was supported by a January 7, 2018 affidavit from relators' expert B. Don Russell. This affidavit provided, in relevant part:

> I have been advised that Plaintiff Eddie Munoz suffered electrocution injuries while standing on the rear deck of a peanut trailer, the height of which was 13 feet. I have been advised that there was a power line above the peanut trailer, and that the line was a 69 KV (phase-to-phase) transmission line measuring 25.38 feet above ground level the day after the contact. I have also been advised that the peanut trailer had a tarp system across the top which was operated by use of a tarp rod that was metal at the end and about 12 feet in length, but connected to a PVC pipe after a few feet.
>
> . . . .
>
> It is my professional opinion that with reasonable engineering certainty the tarp rod came into electrical contact with the 69 KV conductor, that is, the tarp rod was within 1 inch of the conductor when an arc was initiated. That being said, there is a reasonable engineering certainty that the tarp rod was well within 6 feet of the power line at the time electrical contact was made, referencing that the trailer height was 13 feet, the transmission line measured 25.38 feet the day after the accident, and the tarp rod was about 12 feet in length.

As relators now recognize, and as will be discussed further, Russell's statement in his affidavit that the tarp rod was "about 12 feet in length" was factually incorrect—instead, the tarp rod was actually 9 feet and 8 inches long.

On March 1, 2018, relators filed a traditional and no evidence motion for summary judgment against the plaintiffs on grounds that (1) the plaintiffs' pleadings failed to state a viable cause of action because the relators did not owe Munoz any duty under a negligent activity or contemporaneous omission theory, and (2) there was no evidence that Xcel Energy or Xcel Services owed Munoz a duty sounding in premises liability.

8

Relators supported this motion for summary judgment with the same Russell affidavit referenced previously.

On September 17, 2018, SPS moved for partial summary judgment against plaintiffs on the "six-foot rule." Through this motion, SPS alleged that "Munoz's claims against SPS fail as a matter of law" because "SPS was not notified at least 48 hours prior to any work, temporary activity, or function that would cause a person or object to come within six feet of the transmission line." SPS alleged that it "received no notification that work would be conducted underneath or near the line in question." It argued that it was entitled to partial summary judgment as to Munoz's causes of action pursuant to Texas Health and Safety Code §§ 752.001–.008 and the doctrine of circular indemnity.

On October 23, 2018, the plaintiffs filed a traditional and no evidence motion for summary judgment on SPS's Chapter 752 affirmative defense and counterclaim and SPS's contention that Munoz was contributorily negligent. According to the plaintiffs' motion for summary judgment, Munoz's "injuries occurred when the SPS Defendants violated the Texas Utilities Code § 38.004, and therefore committed negligence per se, when their high voltage (69,000 Volt) transmission line was sagged below the statutorily required minimum ground clearance" while Munoz was on top of the trailer, and the transmission line contacted the tarp rod attached to the trailer. The plaintiffs asserted that the height of the trailer was thirteen feet unloaded and twelve feet and ten inches loaded, the total length of the tarp rod was nine feet and eight inches, and the tarp rod was affixed to the top of the trailer. The relators claimed that the height of the line the day after the accident was 25.38 feet. The plaintiffs asserted that the tarp rod would reach, at most, only twenty-two feet and eight inches above the ground if erected fully vertically from a

9

position directly under the power line, and it would require a physical contact or a one-inch space or less between the power line and the tarp rod to create an electrical arc. According to the plaintiffs, a gap of approximately two feet and eight inches between the tarp rod and the power line was insufficient to generate an arc.[5] Thus, according to the plaintiffs, the power line must have sagged lower than 25.38 feet at the time of the accident.

On November 9, 2018, the plaintiffs filed "Plaintiffs' Motion to Strike the Pleadings of Southwestern Public Service Company, Xcel Energy Inc. and Xcel Energy Services, Inc. Pursuant to Texas Rule of Procedure Rule 215.2(b)(5) and Inherent Power to Sanction and for Entry of Default Judgment." This motion engendered the death penalty sanctions against relators. In this motion, the plaintiffs alleged that relators committed various sanctionable acts including: (1) lying to the court, (2) deliberately violating discovery orders and the rules of discovery, (3) refusing to produce and destroying "vital" documentary evidence, committing perjury and fabricating evidence, and (4) hiding the identities of "potentially" key witnesses. The motion is voluminous and comprises, including exhibits, almost eight hundred pages of the record.

Generally speaking, plaintiffs' allegations centered on four categories of discovery: (1) historical data regarding the power line found in "SCADA," the relators' supervisory control and data acquisition control system, and the Schweitzer relay, which senses faults, trips breakers, and has the capacity to record data, (2) repair records for the power line, (3) the identification of witnesses with knowledge of the power line operations

---

[5] Relators characterize the motion for summary judgment as claiming "there were only two ways" that contact with the line could have happened—either he raised the rod and hit the line or the line "sagged 9-feet and caused the contact." We have closely scrutinized the motion for summary judgment and see no such claim regarding a sag of nine feet.

immediately before, on the day of, and after the accident, including the investigation performed by relators, and (4) the Russell affidavit with its false assertion regarding the length of the tarp rod. The motion to strike included the following specific "examples" of the alleged abuse:

- SCADA data gap fraudulent misrepresentations made to the court;

- violation of express court orders to produce all SCADA data;

- hiding and failing to produce complete SCADA [sequence of events] logs;

- fabrication and/or fraudulent manipulation of SCADA data printout documents;

- lies, cover up and hiding made in sworn answers to interrogatories and responses to requests for production about the very existence of the Schweitzer recording relay, and the existence of Schweitzer relay data;

- deliberate destruction of Schweitzer relay critical data evidence and spoliation,

- hiding repair records pertaining to the actually involved or related circuit breakers and relays;

- false testimony about the repair records and deliberate withholding and hiding of these records;

- knowingly presenting a false affidavit in support of their motions for summary judgment in order to mislead, bias and deceive the court; and

11

- hiding the identities and relevant knowledge of potential key witnesses when the identity of such witnesses has been well-known to these defendants for 2 years.

The plaintiffs argued that the trial court had previously imposed lesser sanctions, but the relators had nevertheless continued to abuse the discovery process. The plaintiffs requested that the trial court strike the relators' pleadings and enter a default judgment. That same day, the trial court set the plaintiffs' motion for hearing on November 14, 2018.

On November 9, 2018, relators filed an Emergency Motion for Continuance of the hearing on the plaintiffs' motion to strike and also filed an Amended Emergency Motion for Continuance. Relators argued that the case was set for trial on November 26, 2018, with a pretrial hearing set for November 19, 2018 and hearings on all motions for summary judgment set for November 13, 2018. Relators asserted that the plaintiffs' motion to strike was "untimely and interposed for improper strategic purposes."

Also on November 9, 2018, relators filed multiple motions to exclude the expert testimony of plaintiffs' witnesses: engineer J. Roger Craddock, P.E., Earl Shockley, metallurgist Richard P. Barn, mechanical engineer Dan Wilkerson, and Joe G. Gonzalez, M.D. The plaintiffs, in turn, filed motions to strike the testimony of various of relators' witnesses, including Kenneth Munsell, Byron Craig, Cory Wood, and David Wheeler. Relators further filed a motion to continue the trial of this matter.

On November 12, 2018, relators filed a "Motion to Strike Plaintiffs' Motion to Strike Pleadings of [Relators]." They asserted, inter alia, that the plaintiffs' motion was filed seventeen days before trial and the plaintiffs were "complaining of actions of which Plaintiffs have been aware for months, if not years."

The trial court held a hearing on the foregoing issues on November 13, 2018. Following a conference in chambers, the trial court granted the relators' emergency motion for continuance.

On November 14 and 15, 2018, the trial court issued rulings on the pending motions for summary judgment. The trial court denied SPS's motion for partial summary judgment, granted the plaintiffs' traditional and no evidence motion for summary judgment "in all respects and for all purposes," and denied the relators' motion for summary judgment against the plaintiffs.

On November 19, 2018, the relators filed their response to the plaintiffs' motion to strike. It is seventy-five pages long and has fifty-two exhibits. That same day, the plaintiffs filed a "Memorandum of Law Regarding the Scope of the Court's Inquiry for Plaintiffs' Motion to Strike." The plaintiffs asserted that the trial court should not address the merits of relators' claims and defenses, but instead focus on whether their alleged "willful bad faith abuse of the discovery process is deserving of a presumption of no merit."

On November 21, 2018, the plaintiffs filed "Objections to Late/Non-Disclosed Witnesses under Rule 193.6 and Supplement to Motion to Strike [Relators'] Pleadings." They asserted that relators' response to the motion to strike included "identities of . . . new witnesses accompanied with the inclusion of deliberately secreted information." The plaintiffs criticized the relators' provision of untimely discovery responses and decried relators' attempt to discuss the merits of the case. The plaintiffs asserted that relators failed to timely and properly disclose witnesses Robert DeLong, David Wheeler, Phillip Fetzer, Corby White, Mike Harrison, David Wheeler, Tim Dillon, Sean Ellibee, and Jesus Rodriguez.

13

On Wednesday, November 21, 2018, the trial court advised the parties by email regarding the scope and conduct of the sanction hearing:

Please be advised that I WILL NOT have a trial within a trial. I will be addressing the issue whether the alleged offensive discovery abuse (conduct) and any sanction or lesser sanction I may impose, if any [sic]. I definitely want to address SPS exhibit 25, [counsel for relators'] Affidavit. I will email you all on Friday if I can identify any other particular witnesses I want to hear from. So, please have your witnesses ready that you may need to address the limited scope that I have outlined above. That does not mean that I will allow SPS to call every witness identified in their November 9th, 2018 letter. I'm also concerned that witnesses may be called that have not been disclosed and I want to avoid dragging this hearing on because I'm sure Plaintiffs will object to witnesses that have not been disclosed.

On Friday, November 23, 2018, the trial court emailed the parties that he wished to hear testimony at the sanction hearing from: (1) Maria Vasquez, (2) counsel for relators, Christopher L. Jensen, (3) Kenneth Munsell, and (4) Cory Wood. Relators notified the trial court that Vasquez was unavailable to appear, and the trial court responded:

That's fine she does not need to come down if you all stand by her deposition testimony. . . . Your response was very detailed, including all the exhibits. If you believe you need her, then maybe you can have her come Tuesday, but I have enough information to make a ruling. . . . Mr. Wood is no longer needed, but if you feel you need him then bring him down. Please consider Mediation because I plan on ruling this week. I can delay my ruling if you all want to mediate this case.

On November 26, 2018, the plaintiffs filed a "Reply to Response of [Relators] to Plaintiffs' Motion to Strike the Pleadings of [Relators]." This reply included the affidavit of expert witness Dan Wilkerson. Wilkerson testified, inter alia, that based on his investigation, the power line and associated structures had numerous visible repairs; the logistics of the rolled up tarp prevented the tarp rod from reaching the conductor and measurements taken "preclude[d] any other conclusion of causation other than a drop of the involved conductor to the tarp rod at the time of the incident"; and, though the available

14

SCADA information showed well over one hundred alarms indicating deviations outside preset limits on the date of the accident, the information "which would be most valuable for [the] investigation" was missing. Wilkerson testified that relators' discovery responses included "significant fabricated, made-up evidence in the period immediately before the occurrence of the incident," including false representations made about when the incident occurred, that the data provided was complete, and that that the data included actual measurements and values for the power line. Wilkerson testified that the SCADA data was "critical in order to make an exact determination of the cause of the incident."

The trial court held a four-day hearing on sanctions beginning on November 26, 2018. The plaintiffs called three of the four witnesses that the trial court had requested: Jensen, Munsell, and Wood. Relators did not produce Vasquez to testify at any point during the proceedings. After the plaintiffs rested their case, the relators asked to present their witnesses. As will be discussed in more detail herein, the trial court refused to allow relators to present their witnesses on grounds that relators' witnesses had not been disclosed until recently and their testimony was either cumulative or irrelevant. At the conclusion of the hearing, the trial court took the issue of sanctions under consideration.

After the sanction hearing concluded, relators filed a motion to recuse the judge of the trial court, the Honorable Keno Vasquez, arguing that "[plaintiffs' counsel] had engaged in 'judge shopping'" based on circumvention of the random case assignment system. Judge Vasquez referred the motion to Judge Missy Medary, the Presiding Judge of the Fifth Administrative Judicial Region, for further proceedings. After a hearing, Judge Medary denied the relators' motion to recuse on January 8, 2019.

15

On February 19, 2019, Judge Vasquez signed an order granting death penalty sanctions against relators. The trial court's February 19, 2019 order: (1) strikes relators' pleadings, including all defenses, counter-claims, and cross claims; (2) enters a default judgment in favor of plaintiffs and against relators on all issues of liability; and (3) requires a jury trial regarding the amount of plaintiffs' damages; and (4) provides that "no issues with regard to liability, including proportionate responsibility, shall be submitted to the jury."

This original proceeding ensued. Relators raise four issues. In their first issue, they assert generally that the respondents abused their discretion and mandamus relief should be granted. The relators do not brief this issue separately, and accordingly, we do not treat it separately in this opinion. In their remaining issues, relators assert that: respondent Judge Vasquez abused his discretion by ordering death penalty sanctions and entering a default judgment on liability, including on the issues of proportionate responsibility and gross negligence; respondent Judge Medary abused her discretion by denying relators' timely motion to recuse Judge Vasquez where "there was uncontroverted evidence of 'judge shopping'" by plaintiffs' counsel "through manipulation of the random assignment procedures"; and relators lack an inadequate remedy by appeal. This Court requested and received a response to the petition for writ of mandamus from plaintiffs and received a reply thereto from relators.

## II.    STANDARD FOR MANDAMUS REVIEW

Mandamus is both an extraordinary remedy and a discretionary one. *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam). For mandamus to issue, the relator must show that the trial court abused its discretion and that no adequate

16

appellate remedy exists to cure the error. *In re N. Cypress Med. Ctr. Operating Co.*, 559 S.W.3d 128, 130 (Tex. 2018) (orig. proceeding); *In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 279 (Tex. 2016) (orig. proceeding). The relator bears the burden of proving both requirements. *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding) (per curiam); *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

An abuse of discretion occurs when a trial court's ruling is arbitrary and unreasonable or is made without regard for guiding legal principles or supporting evidence. *In re Garza*, 544 S.W.3d at 840; *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding). Under this standard of review, we defer to the trial court's factual determinations that are supported by evidence, but we review the trial court's legal determinations de novo. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). We determine the adequacy of an appellate remedy by balancing the benefits of mandamus review against the detriments. *In re H.E.B. Grocery Co.*, 492 S.W.3d at 304; *In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding). In deciding whether the benefits of mandamus outweigh the detriments, we weigh the public and private interests involved, and we look to the facts in each case to determine the adequacy of an appeal. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 313 (Tex. 2010) (orig. proceeding); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 469 (Tex. 2008) (orig. proceeding); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136–37.

### III.    RECUSAL

In their third issue, which we take out of order, relators assert that respondent Judge Medary abused her discretion by denying relators' motion to recuse Judge Vasquez where "there was uncontroverted evidence of 'judge shopping'" by plaintiffs' counsel "through manipulation of the random assignment procedures." Relators filed their motion to recuse Judge Vasquez on December 4, 2018. Relators argued that they discovered, during the pendency of the lawsuit, that plaintiffs' counsel had filed a series of "bogus" lawsuits before "selecting" Judge Vasquez's court to litigate the underlying case, and they argued that Judge Vasquez should be recused as a result of the plaintiffs' alleged forum shopping. Relators asserted that recusal is warranted in cases involving alleged forum shopping because "the judge's impartiality might reasonably be questioned." *See* TEX. R. CIV. P. 18b(b)(1); *In re E.R.C.*, 496 S.W.3d 270, 279 (Tex. App.—Texarkana 2016, pet. denied) (discussing the standard for recusal under Texas Rule of Civil Procedure 18b). Judge Vasquez referred the relators' motion to recuse to Judge Medary, who denied it. *See* TEX. R. CIV. P. 18a(f)(2), (g). Relators contend that Judge Medary abused her discretion by refusing to recuse Judge Vasquez.

"An order denying a motion to recuse can be reviewed only for abuse of discretion on appeal from the final judgment." TEX. R. CIV. P. 18a(j)(1)(A);[6] *see In re Estate of*

---

[6] Relators did not address the application of Rule 18a in their petition for writ of mandamus but contend in their reply brief that this rule does not supplant a traditional mandamus review. We interpret our rules of civil procedure using the same principles we apply when construing statutes. *In re City of Dickinson*, 568 S.W.3d 642, 645 (Tex. 2019) (orig. proceeding); *In re Bridgestone Americas Tire Operations, LLC*, 459 S.W.3d 565, 569 (Tex. 2015) (orig. proceeding). We perform a de novo review of the trial court's interpretation and our primary objective is to give effect to the drafter's intent as expressed in the rule's language. *In re City of Dickinson*, 568 S.W.3d at 645–46; *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). We look first to the rule's language and construe it according to its plain meaning. *In re Bridgestone Americas Tire Operations, LLC*, 459 S.W.3d at 569. We are not at liberty to ignore the express text of the rule. *See Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 914 (Tex. 1992) (op. on reh'g) (stating that "it is not in the interest of justice to apply the rules of procedure unevenly or

*Calkins*, 580 S.W.3d 287, 295 (Tex. App.—Houston [1st Dist.] May 30, 2019, no pet.);

*Hawkins v. Walker*, 233 S.W.3d 380, 401 (Tex. App.—Fort Worth 2007, no pet.). The

denial of a motion to recuse is not reviewable on mandamus because there is generally

an adequate remedy by appeal from the final judgment. *See In re Union Pac. Res. Co.*,

969 S.W.2d 427, 427–29 (Tex. 1998) (orig. proceeding). In *Union Pacific*, the supreme

court concluded that it was an abuse of discretion for the court of appeals to review an

order denying recusal by mandamus because the complaining party had an adequate

remedy by appeal. *Id.* at 427. In so holding, the supreme court compared and contrasted

appellate review of orders denying disqualification and recusal:

> Judges may be removed from a particular case either because they are constitutionally disqualified, TEX. CONST. art. V, § 11, because they are subject to a statutory strike, TEX. GOV'T CODE § 74.053(d), or because they are recused under rules promulgated by this Court. TEX. R. CIV. P. 18a, 18b; TEX. R. APP. P. 16. The grounds and procedures for each type of removal are fundamentally different. *See generally* Kilgarlin & Bruch, *Disqualification and Recusal of Judges*, 17 ST. MARY'S L.J. 599 (1986). When a judge continues to sit in violation of a constitutional proscription, mandamus is available to compel the judge's mandatory disqualification without a showing that the relator lacks an adequate remedy by appeal. *Cf. Mitchell Energy Corp. v. Ashworth*, 943 S.W.2d 436, 437 (Tex. 1997) (addressing the mandatory disqualification of assigned judges under TEX. GOV'T CODE § 74.053(d)). This makes sense, because any orders or judgments rendered by a judge who is constitutionally disqualified are void and without effect. *See, e.g.*, *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 148 (Tex. 1982); *Fry v. Tucker*, 146 Tex. 18, 202 S.W.2d 218, 221 (1947). Likewise, on timely objection, the disqualification of an assigned judge who is not a retired judge is mandatory under section 74.053(d) of the Texas Government Code and any orders entered by a trial judge in a case in which he is disqualified are void. *See Mitchell Energy Corp.*, 943 S.W.2d at 440–441; *Fry*, 202 S.W.2d at 221. Therefore, the objecting party is also entitled to mandamus relief without a showing that there is no adequate remedy by appeal. *See Dunn v. Street*, 938 S.W.2d 33, 34–35 (Tex. 1997); *Flores v. Banner*, 932 S.W.2d 500, 501 (Tex. 1996).

inconsistently"); *First State Bank of Miami v. Fatheree*, 847 S.W.2d 391, 394 (Tex. App.—Amarillo 1993, writ denied) (concluding that appellate courts "are not at liberty to add to or change" the rules of civil procedure.

In contrast, the erroneous denial of a recusal motion does not void or nullify the presiding judge's subsequent acts. While a judgment rendered in such circumstances may be reversed on appeal, it is not fundamental error and can be waived if not raised by proper motion. *See Buckholts Indep. Sch. Dist.*, 632 S.W.2d at 148; *Gulf Maritime Warehouse Co. v. Towers*, 858 S.W.2d 556, 559 (Tex. App.—Beaumont 1993, writ denied); *Aguilar v. Anderson*, 855 S.W.2d 799, 809–810 (Tex. App.—El Paso 1993, writ denied); *AmSav Group, Inc. v. Amer. Sav. & Loan Ass'n*, 796 S.W.2d 482, 485 (Tex. App.—Houston [14th Dist.] 1990, writ denied). Recognizing this distinction, our Rules of Civil Procedure expressly provide for appellate review from a final judgment after denial of a recusal motion. *See* TEX. R. CIV. P. 18a(f); *Thomas v. Walker*, 860 S.W.2d 579, 581 (Tex. App.—Waco 1993, orig. proceeding). If the appellate court determines that the judge presiding over the recusal hearing abused his or her discretion in denying the motion and the trial judge should have been recused, the appellate court can reverse the trial court's judgment and remand for a new trial before a different judge. This procedure is no different than the correction of any trial court error through the normal appellate process. As we have observed, "an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ . . . . [T]he 'delay in getting questions decided through the appellate process . . . will not justify intervention by appellate courts through the extraordinary writ of mandamus.'" *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992) (quoting *Iley v. Hughes*, 158 Tex. 362, 311 S.W.2d 648, 652 (1958)).

*In re Union Pac. Res. Co.*, 969 S.W.2d at 428–29 (construing former TEX. R. CIV. P. 18a(f), current version at TEX. R. CIV. P. 18a(j)(1)(A)).

In 2007, the supreme court revisited this issue and reiterated that "mandamus is not available for the denial of a motion to recuse," but acknowledged that "our mandamus standards have evolved" since it decided *Union Pacific*, and "we now ask whether 'any benefits to mandamus review are outweighed by the detriments.'" *In re McKee*, 248 S.W.3d 164, 165 (Tex. 2007) (orig. proceeding) (per curiam) (quoting *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136). In that case, however, the supreme court concluded, again, that the relator had an adequate remedy at law. *Id.*

Subsequent cases conclude that, as a general rule, appeal after final judgment is ordinarily an adequate remedy to review an order denying a motion to recuse. *See In re*

*Rodriguez*, 583 S.W.3d 268, 269 (Tex. App.—Corpus Christi–Edinburg 2019, orig. proceeding) (mem. op.) ("As applicable to this case, the denial of a motion to recuse can be reviewed only on appeal from a final judgment; however, the denial of a motion to disqualify is reviewed by mandamus and may be appealed in accordance with other law."); *In re Sigmar*, 270 S.W.3d 289, 308 (Tex. App.—Waco 2008, orig. proceeding) ("Because Axel has an adequate legal remedy, he is not entitled to mandamus relief in connection with his efforts to have Respondent removed from the case."); *In re Norman*, 191 S.W.3d 858, 860 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (stating that "a relator challenging the denial of a recusal motion ordinarily has an adequate remedy by appeal of the denial of a motion to recuse"); *In re Lutz*, 164 S.W.3d 721, 723–24 (Tex. App.—El Paso 2005, orig. proceeding) ("Review of the denial of a motion to recuse via the normal appellate process is an adequate remedy, and thus intervention in trial court proceedings by appellate courts through the extraordinary remedy of writ of mandamus is not justified.").[7] In terms of exceptions to this general rule, we note that mandamus is available to compel compliance with Rule 18a's mandatory recusal-or-referral requirement. *See*, *e.g.*, *In re Thompson*, 330 S.W.3d 411, 417 (Tex. App.—Austin 2010, orig. proceeding); *In re Norman*, 191 S.W.3d at 860. We further note that at least one of our sister courts has held that mandamus review of an order denying a motion to recuse

---

[7] *See also In re Runnels*, No. 06-19-00061-CV, 2019 WL 3366793, at *1 (Tex. App.—Texarkana July 26, 2019, orig. proceeding) (mem. op.); *In re Smale*, No. 05-17-01466-CV, 2018 WL 360050, at *1 (Tex. App.—Dallas Jan. 11, 2018, orig. proceeding) (mem. op.); *In re Miller*, No. 01-16-00132-CV, 2016 WL 5851904, at *4 (Tex. App.—Houston [1st Dist.] Oct. 6, 2016, orig. proceeding) (mem. op.); *In re Harrell*, No. 01-12-00859-CV, 2012 WL 5878113, at *1 (Tex. App.—Houston [1st Dist.] Nov. 21, 2012, orig. proceeding) (mem. op.) (per curiam); *In re Stafford*, No. 06-11-00090-CV, 2011 WL 3768866, at *1 (Tex. App.—Texarkana Aug. 24, 2011, orig. proceeding) (mem. op.); *In re ES Energy Sols., LP*, No. 05-10-01158-CV, 2010 WL 3720219, at *1 (Tex. App.—Dallas Sept. 24, 2010, orig. proceeding) (mem. op.); *In re King*, No. 06-08-00064-CV, 2008 WL 2545431, at *1 (Tex. App.—Texarkana June 27, 2008, orig. proceeding) (mem. op.).

is available if the grounds for recusal are established as a matter of law. *In re State ex rel. Durden*, 587 S.W.3d 78, 80 (Tex. App.—San Antonio 2019, orig. proceeding).

This case does not involve ministerial duties applicable to the recusal procedures and does not involve allegations pertaining to recusal as a matter of law. We see no extraordinary circumstances which would impact the adequacy of a remedy by appeal and necessitate review by mandamus. We note that relators do not suggest that the forum-shopping allegations underlying their motion to recuse should be addressed in the context of their issue pertaining to the trial court's imposition of death penalty sanctions. Thus, leaving aside the merits of the allegations regarding recusal, we deny the petition for writ of mandamus insofar as it requests that we order the recusal of Judge Vasquez.[8]

## IV. SANCTIONS

In their second issue, relators assert that respondent Judge Vasquez abused his discretion by ordering death penalty sanctions and entering a default judgment on liability, including on the issues of proportionate responsibility and gross negligence. By multiple sub-issues, relators assert: (1) the trial court failed to apply the proper standard for spoliation with regard to missing data; (a) relators had no duty to preserve the missing data and thus did not breach a duty to preserve it; (b) relators did not intentionally or negligently destroy the missing data; and (c) plaintiffs did not suffer any prejudice as a result of the alleged spoliation; (2) the trial court failed to apply the proper standard regarding death penalty sanctions for "other discovery infractions"; (a) the sanction was

---

[8] The plaintiffs contend that we lack mandamus jurisdiction over Judge Medary as the Presiding Judge of the Fifth Administrative Judicial Region. *See, e.g., In re Cook*, 394 S.W.3d 668, 671 (Tex. App.—Tyler 2012, orig. proceeding); *In re Lopez*, 286 S.W.3d 408, 410 (Tex. App.—Corpus Christi–Edinburg 2008, orig. proceeding [mand. denied]); *In re Hettler*, 110 S.W.3d 152, 154 (Tex. App.—Amarillo 2003, orig. proceeding). Having concluded that mandamus is unavailable here, we need not address this argument. *See* Tex. R. App. P. 47.1.

22

disproportionate to any harm; (b) the sanction was not "visited upon the offender"; (c) relators did not show bad faith or callous disregard; (d) plaintiffs bore some responsibility for the alleged infractions; (e) plaintiffs did not suffer prejudice; (f) the trial court did not appropriately consider lesser sanctions; (3) the trial court violated relators' due process rights by precluding "any meaningful participation" by relators at the sanctions hearing; and (4) the trial court erroneously curtailed the impending trial on damages.

## A. Review by Mandamus

"A sanctions order is subject to review on appeal from the final judgment, TEX. R. CIV. P. 215.3, but, under certain circumstances, is subject to review before final judgment by writ of mandamus." *In re Garza*, 544 S.W.3d at 840. "An appeal is inadequate for mandamus purposes when parties are in danger of permanently losing substantial rights," such as "when . . . the party's ability to present a viable claim or defense is vitiated, or when the error cannot be made part of the appellate record." *In re Van Waters & Rogers, Inc.*, 145 S.W.3d 203, 210–11 (Tex. 2004) (orig. proceeding) (per curiam); *see also Walker*, 827 S.W.2d at 843 (stating that an appeal is not an adequate remedy where "the party's ability to present a viable claim or defense at trial is vitiated or severely compromised by the trial court's discovery error").

"Sanctions that thwart effective appellate review by precluding a decision on the merits" and "sanctions that have the effect of adjudicating all or a substantial part of a dispute and for which appeal is realistically an inadequate remedy" are reviewable by mandamus. *In re Garza*, 544 S.W.3d at 840. Stated otherwise, when death penalty sanctions have the effect of adjudicating a dispute, there is no adequate remedy by appeal. *TransAm. Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 919 (Tex. 1991) (orig.

23

proceeding); *see In re Noble Drilling (Jim Thompson), LLC*, 449 S.W.3d 625, 632 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding). Accordingly, this issue is susceptible to mandamus review, and we proceed accordingly.

## B. Applicable Law

Here, the trial court imposed a death penalty sanction for discovery abuse and spoliation.

### 1. Discovery Abuse

Texas Rule of Civil Procedure 215.2 allows a trial court to impose "just" sanctions for discovery abuse. TEX. R. CIV. P. 215.2; *see Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 184 (Tex. 2012). Rule 215 of the Texas Rules of Civil Procedure enumerates a wide array of remedies available to a trial court in addressing discovery abuse, such as an award of attorney's fees or costs to the harmed party, the exclusion of evidence, striking a party's pleadings, or dismissing a party's claims. *See* TEX. R. CIV. P. 215.2–.3; *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 21 (Tex. 2014). Sanctions may be imposed, after notice and a hearing, on parties who refuse to respond, or who give inadequate responses, to valid discovery requests or orders. *See* TEX. R. CIV. P. 215.1–.5. For purposes of these provisions, evasive or incomplete answers are treated as a failure to answer. *Id.* R. 215.1(c). Further, sanctions may be appropriate even when a party eventually complies with a discovery request. *See Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 884 (Tex. 2017); *Drozd Corp. v. Capitol Glass & Mirror Co.*, 741 S.W.2d 221, 223 (Tex. App.—Austin 1987, no writ).[9]

---

[9] We note that relators have alleged, and the record indicates, that the plaintiffs failed to confer on many of the discovery issues that the trial court here ultimately determined were sanctionable misconduct. Parties are expected to cooperate in discovery and make reasonable efforts to resolve discovery disputes without the necessity of court intervention. TEX. R. CIV. P. 191.2 & cmt. 2. Nevertheless, the certificate of

24

We review a Rule 215 sanctions award for abuse of discretion. *Medina v. Zuniga*, 593 S.W.3d 238, 244 (Tex. 2019); *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 489 (Tex. 2014); *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). The broad discretion granted to trial courts to impose discovery sanctions is not unlimited, however, and the award must further one of the recognized purposes of discovery sanctions. *Horizon Health Corp.*, 520 S.W.3d at 884. The purposes of discovery sanctions are to: (1) secure the parties' compliance with the rules of discovery; (2) deter other litigants from violating the discovery rules; (3) punish parties that violate the rules of discovery; and (4) rectify discovery abuse by compensating the aggrieved party for expenses incurred. *Id.* (citing *Christus Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 540 (Tex. 2016); *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986) (per curiam)). We must conduct an independent review of the entire record in determining whether the trial court abused its discretion by imposing sanctions. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam); *Westergren v. Jennings*, 441 S.W.3d 670, 677 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Gunn v. Fuqua*, 397 S.W.3d 358, 366 (Tex. App.—Dallas 2013, pet. denied).

Courts generally follow a two-part test in determining whether a particular sanction for discovery abuse is just. *Christus Health Gulf Coast*, 505 S.W.3d at 540; *Petroleum Sols.*, 454 S.W.3d at 489; *Brookshire Bros.*, 438 S.W.3d at 21; *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917. First, a direct relationship must exist between the offensive conduct, the offender, and the sanction imposed. *Petroleum Sols.*, 454 S.W.3d at 489; *Brookshire*

---

conference is for the court's benefit and the trial court may choose to enforce it or not at the court's option. *Groves v. Gabriel*, 874 S.W.2d 660, 661 n.3 (Tex. 1994) (orig. proceeding) (per curiam); *Clark v. Clark*, 546 S.W.3d 268, 274 (Tex. App.—El Paso 2017, no pet.) (collecting cases).

*Bros.*, 438 S.W.3d at 21; *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003) (per curiam); *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917. To meet this requirement, a sanction must be directed against the wrongful conduct and toward remedying the prejudice suffered by the innocent party. *Petroleum Sols.*, 454 S.W.3d at 489; *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917. In other words, the punishment must fit the crime. *Altesse Healthcare Sols., Inc. v. Wilson*, 540 S.W.3d 570, 572 (Tex. 2018) (per curiam). The sanction must also be "visited upon the offender," and the trial court must attempt to determine whether the offensive conduct is attributable to counsel, the party, or both. *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917.

Second, a sanction must not be excessive, which means it should be no more severe than necessary to satisfy its legitimate purpose. *Petroleum Sols.*, 454 S.W.3d at 489; *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917. This prong requires the trial court to consider the availability of lesser sanctions and, "in all but the most exceptional cases, actually test the lesser sanctions." *Cire*, 134 S.W.3d at 841; *see Petroleum Sols.*, 454 S.W.3d at 489.

### 2.     Spoliation

While the trial court's discretion to remedy an act of spoliation is broad, it is not limitless. *Petroleum Sols.*, 454 S.W.3d at 489. As with other sanctions, we review a trial court's imposition of spoliation sanctions under an abuse of discretion standard. *Id.*; *see Cire*, 134 S.W.3d at 838. We apply the standard two-part test in determining whether the sanctions for spoliation are just. *Petroleum Sols.*, 454 S.W.3d at 489 (discussing the "direct relationship" and "excessive" analyses required by *TransAmerican*). In the context of remedying spoliation, a trial court's discretion to issue remedies akin to death penalty

26

sanctions, such as a spoliation instruction or striking a party's claims or defenses, is limited to circumstances where the court finds (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present a claim or defense. *Id.* The purpose of the sanction must be "to impose an appropriate remedy so that the parties are restored to a rough approximation of what their positions would have been were the evidence available." *Brookshire Bros.*, 438 S.W.3d at 18; *see In re Advanced Powder Sols., Inc.*, 496 S.W.3d 838, 857–58 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding). A spoliator can defend against an assertion of negligent or intentional destruction by providing explanations to justify its failure to preserve evidence. *Trevino v. Ortega*, 969 S.W.2d 950, 957 (Tex. 1998) (Baker, J., concurring); *Miner Dederick Const., LLP v. Gulf Chem. & Metallurgical Corp.*, 403 S.W.3d 451, 466 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *Adobe Land Corp. v. Griffin, L.L.C.*, 236 S.W.3d 351, 359 (Tex. App.—Fort Worth 2007, pet. denied).

### 3. Death Penalty Sanctions

A death penalty sanction is any sanction that adjudicates a claim or defense and precludes the presentation of the merits of a case. *See TransAm. Nat. Gas Corp.*, 811 S.W.2d at 918; *In re Noble Drilling (Jim Thompson), LLC*, 449 S.W.3d at 630; *In re RH White Oak, LLC*, 442 S.W.3d 492, 500–01 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding); *Lanfear v. Blackmon*, 827 S.W.2d 87, 91 (Tex. App.—Corpus Christi–Edinburg 1992, orig. proceeding). There are due process limitations on merits preclusive sanctions. *Medina*, 593 S.W.3d at 244; *Wheeler v. Green*, 157 S.W.3d 439, 443 (Tex. 2005) (per curiam). In short, "there are constitutional limitations upon the power of courts,

27

even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Medina*, 539 S.W.3d at 245 (quoting *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 209 (1958)); *see TransAm. Nat. Gas Corp.*, 811 S.W.2d at 918. "Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 918; *see Paradigm Oil, Inc.*, 372 S.W.3d at 184. "Discovery sanctions that are so severe as to inhibit presentation of the merits of a case should be reserved to address a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *Spohn Hosp.*, 104 S.W.3d at 883; see *Wheeler*, 157 S.W.3d at 443; *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 918. "In rare cases, extreme bad faith alone might justify extreme sanctions." *Altesse Healthcare Sols.*, 540 S.W.3d at 576. However, "[o]ur precedent dictates that courts should avoid a 'trial by sanctions' whenever possible." *Id.*

### C. Spoliation Analysis

Relators assert that the trial court failed to apply the proper standard of review for spoliation claims. In connection with this issue, they assert that (1) they had no duty to preserve the missing data and they did not cause its loss; (2) they did not intentionally or negligently destroy any data; and (3) the plaintiffs did not suffer any prejudice as a result of the alleged spoliation.

The missing data consists of SCADA, including the sequence of events log, the Schweitzer relay, and information from remote terminal units. The Emergency Discovery Order defined SCADA as "the supervisory control and data acquisition control system

28

used by SPS." The sequence of events log captures data on certain points, for example, when a breaker opens and closes. The Schweitzer relay senses faults and trips breakers. It is a recording relay with internal memory which records fault information with the date and time of the fault, the type of fault (whether it is phase to ground or phase to phase), the fault location in miles, and the fault duration in cycles. A remote terminal unit stores sequence of events data and then transmits it to the relators' system. The plaintiffs sought this information to determine, inter alia, whether there were any events or faults that occurred on the power line which could have caused it to sag prior to Munoz's contact with the power line. Relators contend that all of this data was duly recorded but was overwritten in the ordinary course of business in the months following the accident.

Here, the Emergency Discovery Order and the plaintiffs' requests for production and interrogatories requested all documents from SCADA and any event recorders showing the phase voltage and phase current on the power line immediately before the event and after full restoration of power had occurred. Relators' responses to these queries were flatly incorrect and appear to have been designed to obfuscate the existence of this data. Relators initially denied the existence of any SCADA data; however, Jensen conceded that this assertion was inaccurate and agreed that relators should know what SCADA means. Munsell also agreed that, though the relators' responses to the order and discovery queries "seem[ed] to imply we didn't have anything," that was not true, and in fact, relators looked at SCADA data every day. Relators initially identified the Seagraves substation breakers as event recorders but did not disclose the existence of the Schweitzer relay or the remote terminal units. Relators suggest that they were not attempting to hide the Schweitzer data because they produced a single page of paper in

July 2017, a relay setting sheet for Seagraves, which includes the word "Schweitzer." Relators ultimately, after much wrangling, admitted that the requested data was overwritten and was no longer available. Relators contended and provided affidavit testimony that the data from the Schweitzer and the recording relays was overwritten, in part, because of a weather event which occurred on December 17, 2016, which created numerous faults and events thereby filling the system with data related to the weather event. Relators contend that they were unable to locate and produce repair records related to the weather event.

Relators ultimately produced a small part of the sequence of events log. The sequence of events log that relators eventually produced was generated on November 1, 2016, and the entire log covers only 4/10ths of one second of the day for October 26, 2016. Munsell testified that he did not know who downloaded this data on November 1, 2016. Jensen agreed that the sequence of events log "should have been produced, and it wasn't." Munsell agreed that what was produced constituted only a portion of the log and he could not explain why the remainder was not produced.

### 1. Standard for Spoliation Claim

In *Brookshire Brothers*, the Texas Supreme Court adopted a framework governing the imposition of remedies for evidence spoliation. *Brookshire Bros.*, 438 S.W.3d at 19; *see Petroleum Sols.*, 454 S.W.3d at 488 (explaining and applying the *Brookshire* analysis for spoliation remedies). Whether a party spoliated evidence and whether a particular remedy is appropriate are questions of law for the trial court. *Petroleum Sols.*, 454 S.W.3d at 488; *Brookshire Bros.*, 438 S.W.3d at 20. To find that spoliation occurred, the trial court must make affirmative determinations regarding two elements. *Petroleum Sols.*, 454

S.W.3d at 488. First, the party who failed to produce evidence must have had a duty to reasonably preserve the evidence. *Id.*; *Brookshire Bros.*, 438 S.W.3d at 20. Second, the nonproducing party must have negligently or intentionally breached its duty to reasonably preserve material and relevant evidence by failing to do so. *Petroleum Sols.*, 454 S.W.3d at 488; *Brookshire Bros.*, 438 S.W.3d at 20. A party cannot breach its duty without at least acting negligently. *Petroleum Sols.*, 454 S.W.3d at 488; *Brookshire Bros.*, 438 S.W.3d at 20–21 & n.8.

Contrary to relators' contention, we see no evidence or other indication in the record that "the trial court fail[ed] to recognize the missing data complaints as a spoliation issue." The missing data complaints were briefed and argued by all parties as spoliation matters and were submitted to the trial court accordingly. We proceed to apply a spoliation analysis to the missing data.

### 2. Duty to Preserve Evidence

Relators assert that they did not anticipate litigation, and even if they did, they did not know that the overwritten data would be material to the claims in this lawsuit. Relators contend that they would have "to be clairvoyant" to preserve the type of evidence that was overwritten. Relators assert that the fact that they investigated the accident the day after it happened does not indicate that they possessed a duty to preserve the missing data. In connection with this argument, relators assert that they did not receive a "preservation of evidence" letter immediately after the accident and that they were not served with the lawsuit for months after it was filed. Relators claim that their engineers "preserved data relevant to determining if the equipment functioned properly, and the data preserved showed that it did." In contrast, the plaintiffs assert that the relators were on

31

notice to preserve evidence as early as the day after the accident because relators were aware of the severity of the incident on the date that it occurred, and relators sent a ten-person crew to investigate the incident the day after Munoz was injured.

A duty to preserve the evidence "arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Brookshire Bros.*, 438 S.W.3d at 20 (citation and internal quotation marks omitted); *see Petroleum Sols.*, 454 S.W.3d at 488. A "substantial chance of litigation" arises when "litigation is more than merely an abstract possibility or unwarranted fear." *Brookshire Bros.*, 438 S.W.3d at 20. We apply an objective standard in making the determination whether a party should have reasonably anticipated litigation. *See Brookshire Bros.*, 438 S.W.3d at 20 (applying a "reasonable person" standard to duty determination); *IQ Holdings, Inc. v. Stewart Title Guar. Co.*, 451 S.W.3d 861, 868 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (concluding insurer's subjective belief that no substantial chance of a lawsuit existed because relatively few claim denials resulted in litigation each year did not relieve its duty to preserve evidence).

We agree with relators that the fact that they investigated the accident is not determinative regarding whether they knew or reasonably should have known that there was a substantial chance of litigation. *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003) ("We agree that nothing about the investigation or the circumstances surrounding the accident would have put Wal–Mart on notice that there was a substantial chance that the Johnsons would pursue a claim."). However, a party can anticipate litigation before it receives actual notice of potential litigation. *See Clark v. Randalls Food*,

32

317 S.W.3d 351, 357 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). In this regard, we disagree with relators' assertions that the "obligations and the procedures of the company will be different if there is a spoliation letter, especially in a case like this." "Common sense dictates that a party may reasonably anticipate suit being filed . . . [even] before the Plaintiff manifests an intent to sue." *Id.*; *see also In re J.H. Walker, Inc.*, No. 05-14-01497-CV, 2016 WL 819592, at *5 (Tex. App.—Dallas Jan. 15, 2016, orig. proceeding) (mem. op.) ("We are also unpersuaded by Walker Trucking's reliance on the absence of a litigation hold letter at the time the tractor was destroyed to assert it had no duty to preserve evidence. The relevant inquiry is whether a party should have anticipated litigation at the time it destroyed the evidence."). Under the relevant law, a party knows or reasonably should know that there is a substantial chance a claim will be filed if a reasonable person would conclude from the severity of the incident, and other circumstances surrounding it, that there was a substantial chance for litigation at the time of the alleged spoliation. *Miner Dederick Const.*, 403 S.W.3d at 465; *see Tex. Elec. Coop. v. Dillard*, 171 S.W.3d 201, 209 (Tex. App.—Tyler 2005, no pet.).

Here, Munoz suffered severe burns and paralysis as a result of contact with relators' power line. Munsell testified, regarding the paucity of information collected and preserved, that it was not typically "our policy" to collect it; however, he agreed that the accident was not typical and that it was "not common to have contact to the transmission." It is undisputed that the relators were immediately aware of the incident and the severity of the injuries sustained by Munoz. According to Vasquez, the relators sent ten different personnel members to the peanut farm the day after the accident to investigate. Based on the foregoing, we conclude that relators knew or reasonably should have known that

there was a substantial chance that a claim would be filed. *See Petroleum Sols.*, 454 S.W.3d at 488; *Brookshire Bros.*, 438 S.W.3d at 20.

Relators further contend that a spoliation finding is inappropriate because they had no knowledge that the missing data would be material or relevant to any claim made in the lawsuit. A duty to preserve the evidence "arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Brookshire Bros.*, 438 S.W.3d at 20 (citation and internal quotation marks omitted); *see Petroleum Sols.*, 454 S.W.3d at 488. To show that the evidence is relevant and material, a party must demonstrate that the alleged spoliator knew or should have reasonably known that the evidence would be relevant to the action or would be reasonably calculated to lead to the discovery of admissible evidence. *See Miner Dederick Const.*, 403 S.W.3d at 466; *see also Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 380 (Tex. App.—Fort Worth 2012, pet. denied) ("There must be a sufficient foundational showing that the party who destroyed the evidence had notice both of the potential claim and of the evidence's potential relevance thereto.").

Relators argue that plaintiffs' theory of the accident changed throughout the course of the case and they had only recently adopted a theory that a previous event on the power line caused it to sag, thereby contacting the tarp rod. Relators thus contend that they had no knowledge that activity on the power line the day of the incident would be material. However, the plaintiffs alleged that relators breached a general negligence duty from the inception of the lawsuit. The relators were concerned with the height of the power line and measured the height of the power line during their investigation immediately

following the accident. In fact, Vasquez testified that these measurements were taken so that "information could be provided to the appropriate persons to perform sag calculations and to make sure that those conductors were within compliance . . . ." Based on this record, there is no dispute regarding the premise that certain electrical incidents can cause the power line to sag, even though there may be disagreement regarding the scope or extent of the resultant sagging. Further, and significantly in this analysis, the relators looked at this data themselves after the accident as illustrated by the sequence of events data, which relators recorded on November 1, 2016, of 4/10ths of one second on October 26, 2016. *See In re Advanced Powder Sols.*, 496 S.W.3d at 857 (concluding that the trial court "could reasonably have concluded, within its sound discretion" that relator's actions constituted "at least willful blindness to the destruction of evidence" where it viewed and utilized videotape and thereby "made use of it, then did not endeavor to keep it from being destroyed by an automated process"). Based on the foregoing, the trial court had before it sufficient evidence to conclude that the relators knew or reasonably should have known that the missing data would be relevant to the action or would be reasonably calculated to lead to the discovery of admissible evidence. *See Miner Dederick Const.*, 403 S.W.3d at 466.[10]

### 3. Breach of Duty to Preserve

Relators contend that they did not commit intentional or negligent destruction of the missing data and there is no evidence to support such a claim other than speculation. They assert that the data was merely overwritten in the ordinary course of business and

---

[10] We note that relators' claims that they were unaware that the evidence would be relevant or material are, to some extent, untimely. The trial court's order specifically required production of the data at issue, the discovery requests sought that data, and relators never attacked the trial court's order or the discovery requests on grounds that they required or requested the production of irrelevant data.

such an operation does not constitute spoliation. A party that has a duty to preserve evidence has a duty to exercise reasonable care in preserving it. *Miner Dederick Const.*, 403 S.W.3d at 467; *Clark*, 317 S.W.3d at 357. "Implicit in the duty to exercise reasonable care in preserving evidence is the duty to refrain from altering or changing the evidence's condition or integrity." *Miner Dederick Const.*, 403 S.W.3d at 467. A claim that the evidence was destroyed in the ordinary course of business will not excuse the obligation to preserve when a party's duty to preserve evidence arises before the destruction. *See id.*; *Adobe Land Corp.*, 236 S.W.3d at 359. As discussed above, the evidence shows that relators' duty to preserve the missing data arose before the data was destroyed. Therefore, relators' failure to preserve the missing data cannot be justified on the basis that the evidence was destroyed in the ordinary course of business. *See Miner Dederick Const.*, 403 S.W.3d at 466; *Adobe Land Corp.*, 236 S.W.3d at 359. Moreover, based on this record, relators used the data, affirmatively misrepresented that it did not exist, and only admitted its existence after accidentally producing a minuscule portion of it.

### 4. Prejudice

Finally, relators assert that the plaintiffs cannot show the prejudice required to sustain a spoliation finding. They assert that a spoliation finding requires that the failure to preserve evidence so prejudiced the plaintiffs that they are irreparably deprived of having any meaningful ability to present a claim or defense. They argue that the trial court's sanction order fails to meet this standard insofar as it states only that the plaintiffs' case was hampered or harmed.

We disagree with relators' contention that prejudice is a prerequisite for a spoliation finding. Rather, prejudice is relevant to the remedy chosen once spoliation has been

36

found. Upon finding that spoliation occurred, the trial court must exercise its discretion in imposing a remedy. *Petroleum Sols.*, 454 S.W.3d at 488. In determining what remedy, if any, is appropriate, the court should weigh the spoliating party's culpability and the degree of prejudice to the nonspoliating party. *Id.* at 488–89; *Brookshire Bros.*, 438 S.W.3d at 21.

> Prejudice is evaluated based on the spoliated evidence's relevancy to key issues in the case, whether the evidence would have been harmful to the spoliating party's case (or, conversely, helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used in its stead.

*Petroleum Sols.*, 454 S.W.3d at 489; *see In re Advanced Powder Sols.*, 496 S.W.3d at 857. In short, prejudice requires that the unavailable evidence would have been probative of dispositive issues. *See Ham v. Equity Residential Prop. Mgmt. Servs., Corp.*, 315 S.W.3d 627, 635 (Tex. App.—Dallas 2010, pet. denied).

Spoliation is not the only sanctionable conduct at issue in this original proceeding. Accordingly, we will address the issue of prejudice and whether or not the trial court's death penalty sanction was the appropriate remedy in connection with the relators' remaining issues.

### D. Analysis of Discovery Violations

Relators assert that the court's findings concerning "other alleged discovery violations" failed to satisfy *TransAmerican*'s requirements for the imposition of a death penalty sanction. *See TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917–18. Relators contend the trial court failed to follow *TransAmerican* and apply the proper standard regarding death penalty sanctions because: (a) the sanction was disproportionate to any harm; (b) the sanction was not "visited upon the offender"; (c) relators did not show bad faith or callous disregard; (d) the plaintiffs bore some responsibility for the alleged infractions; (e)

37

plaintiffs did not suffer prejudice; and (f) the trial court did not appropriately consider lesser sanctions. Relators contend that the "discovery abuse allegations fall into three categories: (1) late or inadequately disclosed evidence and witnesses; (2) improper corporate representative designations, interrogatory responses, and testimony; and (3) a false summary judgment affidavit." Relators assert that these "curable" discovery abuse allegations could not support a death penalty sanction under *TransAmerican*.

While relators dispute that they committed these "other" discovery infractions, they provide no briefing or analysis to disprove these charges on their merits.[11] Rather, relators contend that these "separate and distinct discovery abuse allegations, even if true, are relatively trivial and could never support death penalty sanctions," and that the "purported infractions concerning untimely production, witness problems, and the allegedly false affidavit were remediable by far lesser means." Accordingly, for purposes of this proceeding, we assume, unless otherwise stated, that these "other" allegations of discovery abuse are true. In this regard, our review of the record indicates that the trial court had before it evidence sufficient to support findings that relators, inter alia, failed to timely produce evidence within their possession, failed to properly identify key witnesses, provided various false and misleading answers to discovery requests, and otherwise committed numerous instances of sanctionable conduct. The following is a brief summary of some of the problems apparent in the record.

---

[11] While the petition for writ of mandamus addresses the allegedly spoliated data in some detail, the other alleged discovery infractions are described as falling into the three categories set forth above: (1) late or inadequately disclosed evidence and witnesses; (2) improper corporate representative designations, interrogatory responses, and testimony; and (3) a false summary judgment affidavit. In discussing these infractions, relators provide some of the factual underpinnings and a brief explanation of the charges pertaining to the improper corporate representative designation, the false affidavit, and one late disclosed witness, however, relators do not provide details describing the remaining charges against them or any evidence adduced at the sanction hearing. For instance, relators do not identify the interrogatory responses and testimony that were allegedly improper.

There are, for instance, numerous instances where relators' witnesses provided testimony with false information or testimony that was flatly obfuscatory. On July 14, 2018, Kenneth R. Munsell, the relators' Manager for Substation Engineering and Design, testified by affidavit that, inter alia, "there would be no data recorded or stored relating to the incident in question on the Y95 circuit beyond the Seagraves Interchange." This was affirmatively incorrect. When asked if this statement was true at the sanction hearing, Munsell testified that it was not and acknowledged that "[t]here was other data outside of Seagraves," but attempted to excuse the response on grounds "the intent was to indicate there was no SCADA data outside of Seagraves interchange" and stated that "it was worded poorly."

In this same affidavit, Munsell also testified that a "conductor may sag due to heating from overcurrent," and stated that the conductor would have to reach a temperature of 370.6 degrees before it would sag below the NESC-mandated ground clearance of 19 feet, 2 inches, and that the conductor would not reach this temperature at loads less than 523 amps. Munsell stated that he "examined the historical load data for the Y95 line for October 26, 2016," that the "historical load data measures the load every second," and the "peak load seen on October 26, 2016 is 97.8 amps." He further stated that the data he examined was obtained "directly" from a database used by relators, that the data was provided to plaintiffs, and the "data set includes information from each second of the day of October 26, 2016 without any deletions or alterations." This was affirmatively incorrect. Munsell subsequently testified that he was unaware that there was a gap in the data or that the data contained repeating lines. He admitted that he did not

see the repeating data because he calculated the peak load on the line without reviewing each line of the data.

In this same vein, relators provided inconsistent testimony about the historical load data for the power line—testifying first that it was complete and accurate, then admitting that the data contained repeating numbers but representing that this phenomenon merely meant that the load on the power line had not changed during this duration of time, then admitting that the data contained a "gap," then testifying that the "gap" represented a failure of communications within the relators' network.

Similarly, the discovery pertaining to repair records for the power line is problematic, at best. Plaintiffs sought repair records to determine whether the power line had been properly maintained and situated at an appropriate height. On November 19, 2018, Cory Wood, relators' Regional Director for Transmission, whose duties include new construction and maintenance of transmission lines as well as substation construction, testified by affidavit that:

> In August 2017, I was asked to serve as the corporate representative for purposes of giving deposition testimony concerning, among other things, records of repairs to what is known as the Y95 power line where Eduardo Munoz was injured. At that time, I believed that the investigator, Maria Vasquez, had requested repair records relating to that segment. I asked her about her investigation, but also knew that she had asked for records regarding work done on that segment. At the time of my deposition in 2017, I was not aware of the existence of any repair records relating to the line segment.
>
> In August 2018, in connection with further investigation concerning records, I was asked to again look for records relating to the Y95 circuit from 2010 to current. I talked to Erin Feyereisen, Manager in Transmission Project Controls, to see if she could locate work order information on the Y95 Circuit for this time period. I also spoke with Rick Childs, Superintendent for Transmission Line Maintenance, to see if he could locate any repair records for the circuit for the time period. I also spoke with B.J. Hatfield, Manager of Transmission Line Department, to see if he knew where additional records

> might be located or who might know how to locate additional records. Ms. Feyereisen was able to locate and produced work order documentation. Mr. Childs was able to locate and produced the repair records. The repair records were not available in SPS's software system. Mr. Childs located the repair records in file boxes in a storage area in the back of the shop.

Relators have not located or produced other repair records for the power line with regard to repairs and splices that were visibly apparent to the power line upon inspection or with regard to other documents produced by relators indicating instances where the power line had been repaired. Relators urge us to conclude that they cannot be sanctioned for failing to locate or produce repair records for a federally controlled high-voltage power line; however, it is within the trial court's province to determine the credibility of this allegation.

Further, the record indicates that relators failed to timely and properly identify certain witnesses, including Cory Beauchamp. Beauchamp was discussed during Wood's deposition on August 7, 2017 and was identified at that time as a person who was part of the initial team who investigated the accident. Munsell subsequently testified that Beauchamp worked on the relay involved in the accident. Specifically, Beauchamp worked on the Seagraves breaker six days before the accident, the day of the accident, and was again at the Seagraves station immediately after the accident. Munsell testified that Beauchamp could not remember one specific thing he asked him about his work, and Beauchamp's timesheets simply state "station reads" or "station inspections." In short, relators failed to properly and timely identify Beauchamp, an employee who worked on the power line immediately before the accident, the day of the accident, and immediately after the accident, and participated in the accident investigation, and who allegedly now lacks any memory of the foregoing matters.

41

Finally, the trial court had before it evidence from which it may have concluded that the documents produced by relators contained anomalies suggesting that they had been altered for purposes of the litigation. As an example, relators produced an undated email with the Schweitzer relay information to plaintiffs but produced a dated email with that same information to their own expert. Munsell could not explain how or why the email without a date was generated or why it had not been previously produced. As a separate example, Munsell admitted that at least one of the charts produced by relators included duplicate entries which he asserted constituted accidental replication of the data involved.

Given the relators' allegations in this original proceeding and the state of the record, we will further address these "separate and distinct discovery abuse allegations" in the context of the sanction imposed by the trial court .

### E.      Due Process

Relators contend that the imposition of death penalty sanctions violates their due process rights in several respects. They assert that the trial court "precluded any meaningful participation by [relators] at the sanctions hearing" because they were not allowed to present testimony to explain their procedures for the preservation of data or explain their theory that the plaintiffs were not prejudiced by any of the alleged discovery infractions. Relators had several witnesses ready and offered bills of proof regarding their testimony. Relators further contend that the trial court could not determine the credibility of the witnesses based on affidavit testimony alone. Relators assert that allowing the plaintiffs to present evidence and then terminating the hearing before the opposing parties present their defense is a clear abuse of discretion. Relators also allege that the trial court improperly allowed the plaintiffs to add evidence to the record after they "closed" on the

presentation of their motion for sanctions and assert that the trial court erred in taking judicial notice of the entire file. They further contend that the sanction order exceeds the scope of the sanctions motion.

The rules and due process require notice and hearing before the imposition of sanctions. *See* TEX. R. CIV. P. 215.2, 215.3; *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (orig. proceeding) (per curiam) (noting that the right to due process limits a court's power to sanction); *In re Hereweareagain, Inc.*, 383 S.W.3d 703, 710–11 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding) (stating that proceedings for sanctions must comport with due process); *In re Park Mem'l Condo. Ass'n*, 322 S.W.3d 447, 450 (Tex. App.— Houston [14th Dist.] 2010, orig. proceeding) ("Due process, on a fundamental level, requires notice and a fair opportunity to be heard."); *Kugle v. DaimlerChrysler Corp.*, 88 S.W.3d 355, 361 (Tex. App.—San Antonio 2002, pet. denied) ("A trial court abuses its discretion if it violates due process by imposing sanctions without notice or a meaningful hearing."); *see also Tidrow v. Roth*, 189 S.W.3d 408, 413 (Tex. App.—Dallas 2006, no pet.). However, the Texas Supreme Court has expressly held that a "hearing" in this context does not necessarily contemplate a personal appearance before the court or an oral presentation to the court. *Cire*, 134 S.W.3d at 843–44; *see McCollum v. Bank of N.Y. Mellon Tr. Co.*, 481 S.W.3d 352, 358 (Tex. App.—El Paso 2015, no pet.) (concluding that the sanctioned party "was not entitled to an oral or evidentiary hearing" before the trial court ruled on sanctions); *Clark v. Bres*, 217 S.W.3d 501, 514 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("There is not even a requirement of an oral hearing."); *see also Tidrow*, 189 S.W.3d at 413 (stating that an oral hearing is not required prior to the imposition of discovery sanctions).

Whether to admit or exclude evidence is within the trial court's sound discretion. *Morale v. State*, 557 S.W.3d 569, 573 (Tex. 2018) (per curiam). "The exclusion of evidence is reversible error if the complaining party shows that the trial court committed error that probably caused the rendition of an improper judgment." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 812 (Tex. 2010); *see also* Tex. R. App. P. 44.1(a). The exclusion of evidence is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018).

### 1. Participation

Here, the motion to strike and relators' reply were supported by numerous affidavits. At the sanctions hearing, the trial court heard testimony from relators' counsel and several of relators' witnesses. The relators made offers of proof regarding proposed testimony from witnesses Robert "Bobby" DeLong, Mike Harrison, Phillip Fetzer, David Wheeler, Corby White, Tim Dillon, and Jesus Rodriguez. The trial court noted that these witnesses had not been disclosed by relators until recently, concluded that they would lack knowledge of the alleged discovery abuse, and concluded that their late designations were part of the relators' overall pattern of discovery abuse. Each of these individuals had provided affidavit testimony in support of relators' response to plaintiffs' motion to strike, and after hearing their proposed testimony in the offers of proof, the trial court concluded that their proposed oral testimony was repetitive or cumulative to their affidavit testimony and was irrelevant to the issues under consideration. The trial court also heard an offer of proof regarding Russell, who "would testify that he got [the information about the tarp rod] from counsel and—and through no other source." And, finally, the trial court heard

44

an offer of proof for Munsell, who testified at the sanction hearing but was not allowed to testify regarding relators' allegations that they had a meritorious defense and that the plaintiffs were not prejudiced by any errors regarding the preservation of evidence or discovery. Again, the trial court concluded that Russell and Munsell's testimony was not relevant to the issues at hand.

We conclude that the trial court did not abuse its discretion in circumscribing the live testimony sought to be adduced by relators. As a threshold matter, the trial court could have handled the motion to strike by submission and was not required to hold an evidentiary hearing. *See Cire*, 134 S.W.3d at 843–44; *McCollum*, 481 S.W.3d at 358; *Clark*, 217 S.W.3d at 514; *see also Martin v. Martin, Martin & Richards, Inc.*, 989 S.W.2d 357, 359 (Tex. 1998) (per curiam) (observing that "not every hearing called for under every rule of civil procedure necessarily requires an oral hearing," unless required by the express language of the rule). The trial court had granted relators a continuance of the hearing on the motion for sanctions and directed relators to file affidavits from any relevant witnesses that they wished to present. At the hearing, relators were given an opportunity to argue in opposition to the plaintiffs' motion to strike and explain their conduct to the trial court. *See Allied Chem. Co. v. DeHaven*, 824 S.W.2d 257, 263 (Tex. App.—Houston [14th Dist.] 1992, no writ) (concluding that adequate opportunity to be heard prior to the imposition of sanctions where the party "was given an opportunity to argue in opposition of the sanction and explain its conduct to the trial court"). And, to the extent that relators were prevented from offering their witnesses, we have compared the offers of proof with the affidavit testimony from each and agree that, in sum, their proposed testimony was both repetitive and cumulative.

**2.      Merits**

In connection with this issue, relators have asserted that the trial court erred in refusing to consider the merits of the plaintiffs' lawsuit because such a consideration is necessary for any consideration or evaluation regarding whether the plaintiffs were prejudiced. Relators contend, in short, that the plaintiffs were going to lose their case on the merits because, inter alia, relators' experts had recently deemed impossible the plaintiffs' theory that preceding events on the power line caused it to sag into contact with the tarp rod.

Our sister court in Fort Worth recently considered and rejected a similar argument regarding the interplay between merits consideration and sanctions. *See Estate of Radelat*, No. 02-17-00264-CV, 2019 WL 5792652, at *1 (Tex. App.—Fort Worth Nov. 7, 2019, pet. filed) (mem. op.). In that case, the appellants asserted that death penalty sanctions were precluded because the appellee's causes of action against them for mishandling an estate were barred by the statute of limitations. *Id.* The Fort Worth Court of Appeals disagreed with this premise for two basic reasons:

> First, as we see it, the merits of the case itself are not before us. True, there are some cases where Texas courts have applied the logic that appellants advocate, using the apparent merits of the case to reverse a death penalty sanction. For instance, in *Remington Arms Company v. Caldwell*, the jury rendered a verdict against a products liability plaintiff, but after trial, the trial court nonetheless granted a mistrial and rendered death penalty sanctions against the defendant. 850 S.W.2d 167, 169 (Tex. 1993) (orig. proceeding) (op. on reh'g). Writing for the court, Justice Cornyn reasoned that when the jury resolved the merits of the case in favor of the defendant, this defeated any presumption that the defendant's claims lacked merit, making death penalty sanctions inappropriate. *Id.* at 171. Similarly, in *Chrysler Corporation v. Blackmon*, the court addressed a products liability suit alleging that a vehicle's defects caused a collision, but the plaintiff admitted in a discovery response that another driver's negligence was also to blame for causing the collision. 841 S.W.2d 844, 850 & n.12 (Tex. 1992). Again writing for the court, Justice Cornyn reasoned that this admission undercut

46

a presumption that the claims lacked merit: the plaintiffs had effectively admitted that there was merit in the defendant's comparative-fault defense, and because a death penalty sanction would essentially treat this defense as meritless, the sanction could not stand. *Id.* Other courts have applied this thinking as well. *See, e.g.*, *In re TAH Invs., LLC*, No. 14-19-00161-CV, 2019 WL 2062923, at *5 (Tex. App.—Houston [14th Dist.] May 9, 2019, orig. proceeding) (mem. op.) (per curiam). Thus, appellants' thinking is not at all foreign to Texas law.

But unlike *Remington* and *Chrysler*, wherein the merits had already been resolved by trial and admission, respectively, here we have no concrete basis on which to judge the merits. This is not an appeal from summary judgment, a trial on the merits, or any other sort of exercise that truly assesses the worth of the sanctioned party's claims and defenses. At this juncture, the sole window we have into the merits is the parties' pleadings, which may or may not be true. Under Texas law, many questions must be satisfactorily answered before a death penalty sanction may be rendered, but we do not believe that either due process or the rules of civil procedure require us to forecast how likely the sanctioned defendant would be to prevail in the absence of a sanction—and to do so based solely on the party's pleadings. Parties who severely offend the process of justice are not exempt from sanctions simply because they have the better pleadings.

Second, to the extent that appellants' conduct does place the merits before us, their course of action militates toward the conclusion that the limitations defense lacks merit. To justify a presumption that the claim lacks merit, the misconduct must, at a minimum, reveal some detrimental truth about the sanctioned party's claim or defense. *See Khan v. Valliani*, 439 S.W.3d 528, 535 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In *Khan*, for example, the court recognized that the failure to pay $400 in attorney's fees for contempt of court revealed nothing about the merits. *Id.* It was simple dereliction, oriented toward financial concerns rather than the truth or falsity of the underlying claims.

Other forms of misconduct, though, may tell of the case's merit. Refusal to produce evidence that goes to the "heart of" the case may warrant the belief that full and fair disclosure would be damning for the refusing party. *Cire*, 134 S.W.3d at 841. Accordingly, "if a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim or defense lacks merit and dispose of it." *TransAm.*, 811 S.W.2d at 918; *see Cire*, 134 S.W.3d at 841 (holding that death penalty sanctions were justified by plaintiff's repeated refusal to produce critical audiotapes needed to dispute plaintiff's claim, by later destroying those tapes, and by misrepresenting the circumstances to the trial court).

The same might be said of pervasive and persistent obstruction of the discovery process in general. *See 5 Star Diamond, LLC v. Singh*, 369 S.W.3d 572, 579 (Tex. App.—Dallas 2012, no pet.) (concluding that prolonged general resistance to discovery, despite multiple orders compelling responses, justified death penalty sanction); *Palau v. Sanchez*, No. 03-08-00136-CV, 2010 WL 4595705, at *12 n.10 (Tex. App.—Austin Nov. 10, 2010, pet. denied) (mem. op.) (holding that a pattern of noncompliance in the face of increasing sanctions was enough to justify presumption that merit was lacking); *Finley Oilwell Serv., Inc. v. Retamco Operating, Inc.*, 248 S.W.3d 314, 322 (Tex. App.—San Antonio 2007, pet. denied) (holding that there was no abuse of discretion in striking the pleadings based on defendant's disregard of several orders compelling response and monetary sanctions); *In re Zenergy, Inc.*, 968 S.W.2d 1, 6, 11 (Tex. App.—Corpus Christi–Edinburg 1997, orig. proceeding) (concluding that false testimony and pervasive concealment of information, despite orders compelling disclosure, justified death penalty sanctions).

Courts have also considered violations of a temporary injunction in determining whether a presumption that the claim lacks merit was justified. *See Caron v. Smaby*, No. 01-15-00528-CV, 2017 WL 2471101, at *10, *12 (Tex. App.—Houston [1st Dist.] June 8, 2017, no pet.) (mem. op.); *Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 171 (Tex. App.—Dallas 2011, pet. denied). And false statements to the court have been held to call for extreme measures as well. *See Redmond Legal Grp., PLLC v. Chatman*, No. 14-17-00835-CV, 2019 WL 4021930, at *3 (Tex. App.—Houston [14th Dist.] Aug. 27, 2019, no pet. h.) (mem. op.) (collecting cases).

*Id.* at *4–5.

We agree with this reasoning. Applying it here, we note that this is not an appeal from a summary judgment, a trial on the merits, or any other sort of exercise that truly assesses the worth of the relators' claims and defenses. In this regard, to the extent that relators appear to be inviting us to review the trial court's previously granted summary judgments, those matters are not within the scope of this mandamus review. Requiring merits-based analysis prior to the imposition of sanctions would effectively require full-blown litigation as to the merits prior to the imposition of sanctions and would impair judicial efficiency and the prompt disposition of cases. Further, such an analysis would

defeat one of the purposes of sanctions—to ensure that a party will not be able to profit from its malfeasance—by allowing a sanctionable party to nevertheless prevail when its actions prevent the opposing party from success on its claims. Here, for instance, relators filed multiple *Daubert* motions against plaintiffs and their expert, Wilkerson, on grounds that "he cannot adequately explain causation." But Wilkerson expressly testified that he required the missing data to complete his calculations. And finally, relators' argument that merits analysis is necessary would inappropriately truncate the trial court's duties and responsibilities to use sanctions to ensure proper compliance with the judicial process generally. *See*, *e.g.*, *In re Bennett*, 960 S.W.2d at 40 (stating that trial courts have the inherent power to sanction parties for abusing the judicial process, to ensure an adversarial proceeding, to aid in the exercise of the court's jurisdiction, in the administration of justice, or in the preservation of the court's independence and integrity); *Liles v. Contreras*, 547 S.W.3d 280, 290–91 (Tex. App.—San Antonio 2018, pet. denied) (discussing the trial court's inherent authority to sanction "for interference with a court's traditional core functions, which include: hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, rendering final judgment, enforcing its judgment, managing its docket, and the issuance and enforcement of its orders" and "for conduct, that if tolerated, 'breeds disrespect for and threatens the integrity of our judicial system'"); *see also Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398–99 (Tex. 1979); *Westview Drive Invs., LLC v. Landmark Am. Ins. Co.*, 522 S.W.3d 583, 613 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

49

### 3. Judicial Notice

Relators further contend that the trial court erred in taking judicial notice of its file. At the conclusion of the sanctions hearing, the parties and trial court engaged in a discussion regarding the status of the record and various items of evidence and discussed taking judicial notice of the pleadings and exhibits pertaining to sanctions. Relators affirmatively asked the trial court to take judicial notice and they repeatedly sought assurance that the trial court would take judicial notice of "of what's in our response" and "the affidavits that were in the file." The trial court stated that he would "take judicial notice of all documents on file, and any exhibits attached to your petition, your response, will be admitted into evidence." At this point in the proceeding, relators objected because they had not had the opportunity to file objections to the plaintiffs' exhibits to the motion to strike. Counsel for relators finally asserted that the trial court could not take judicial notice of any evidence or facts contained in the filed pleadings. The court overruled the relators' objection.

A trial court's action in taking judicial notice is reviewed for an abuse of discretion. *In re Estate of Downing*, 461 S.W.3d 231, 239 (Tex. App.—El Paso 2015, no pet.); *Keller v. Walker*, 652 S.W.2d 542, 543 (Tex. App.—Dallas 1983, no writ). It is well-settled that a trial court can properly take judicial notice of its own records and prior pleadings in the case, with or without a request of a party. TEX. R. EVID. 201(c); *see, e.g., In re Estate of Downing*, 461 S.W.3d at 239–40; *In re J.A.S.C.*, 430 S.W.3d 544, 545 n.2 (Tex. App.—Dallas 2014, no pet.); *Cognata v. Down Hole Injection, Inc.*, 375 S.W.3d 370, 379 (Tex. App.—Houston [14th Dist.] 2012, pet denied); *In re Estate of Clark*, 198 S.W.3d 273, 275 (Tex. App.—Dallas 2006, pet. denied). "It is appropriate for a court to take judicial notice

of a file in order to show that the documents in the file are a part of the court's files, that they were filed with the court on a certain date, and that they were before the court at the time of the hearing." *In re C.S.*, 208 S.W.3d 77, 81 (Tex. App.—Fort Worth 2006, pet. denied).

The trial court may not take judicial notice of the truth of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file. *See*, *e.g.*, *Hogg v. Lynch, Chappell & Alsup, P.C.*, 480 S.W.3d 767, 783 (Tex. App.—El Paso 2015, no pet.); *Guyton v. Monteau*, 332 S.W.3d 687, 692–93 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *In re C.L.*, 304 S.W.3d 512, 514–15 (Tex. App.—Waco 2009, no pet.). When evidence is the subject of improper judicial notice, it amounts to no evidence. *Guyton*, 332 S.W.3d at 692–93; *Augillard v. Madura*, 257 S.W.3d 494, 503 n.14 (Tex. App.—Austin 2008, no pet.).

As a pragmatic matter, insofar as the basis of relators' objection was their inability to make objections during the hearing, we conclude that relators had more than sufficient time to file objections to the plaintiffs' evidence that was attached to their motion to strike. The plaintiffs' motion to strike was filed on November 9, 2018, the hearing on sanctions began on November 26, 2018, and the trial court stated it was taking judicial notice on November 30, 2018. Essentially, the relators' objections were not timely. *See* TEX. R. APP. P. 33.1(a).

Further, we disagree with relators' contention that the trial court erred in taking judicial notice. First, as a threshold matter, relators asked the court to take judicial notice of their own pleadings and affidavits. *See In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (orig. proceeding) (discussing the scope of the invited error

51

doctrine). Second, relators' contentions run afoul of the trial court's scope of review regarding the imposition of sanctions. At a hearing on a motion for sanctions, "the trial court can consider the arguments of counsel and all orders and documents before it." *Jefa Co, v. Mustang Tractor & Equip. Co.*, 868 S.W.2d 905, 910 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *see Hogg*, 480 S.W.3d at 783 (noting that, while a court cannot take notice of the truth of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file, a "court may take judicial notice of its own records for other purposes"); *Cognata*, 375 S.W.3d at 379–80 ("We presume that the trial court took notice of its contempt order and considered it as evidence when deciding whether Cognata had engaged in sanctionable conduct."); *Lacy v. First Nat'l Bank of Livingston, Tex.*, 809 S.W.2d 362, 367 (Tex. App.—Beaumont 1991, no writ) ("The trial judge may properly take into consideration the file which is before him in his court as well as the proceedings that are conducted in his presence. And the trial court under these circumstances is presumed to have taken judicial notice." (citations omitted)). Third, and in any event, relators fail to explain how the trial court's action harmed them. *See* TEX. R. APP. P. 44.1(a). We overrule this sub-issue.

### 4. Addition of Evidence

Relators contend that the trial court erred in allowing the plaintiffs to "add evidence to the record" after they had rested. As with the judicial notice issue, relators argue that this alleged error deprived them of the opportunity to examine the veracity of the evidence, either through cross-examination or objections. Relators do not identify the additional evidence, they do not offer argument regarding the harmfulness of the alleged error, and

52

they cite no authority in support of the proposition that the trial court lacked authority to allow additional evidence. Accordingly, we overrule this sub-issue.

### 5.    Notice

Relators contend that the sanction order exceeds the scope of the plaintiffs' sanction motion. They assert that the trial court violated their rights by sanctioning them for conduct that exceeds the scope of the motion for sanctions and that they were wrongfully deprived of adequate notice of the charges against them.

"[A] trial court may not award sanctions on a basis not asserted in the motion." *Polansky v. Berenji*, 393 S.W.3d 362, 369 (Tex. App.—Austin 2012, no pet.); *see Greene v. Young*, 174 S.W.3d 291, 298–301 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (reversing sanctions awarded because parties did not have notice of legal basis or conduct under consideration for sanctions); *Ball v. Rao*, 48 S.W.3d 332, 338 (Tex. App.— Fort Worth 2001, pet. denied) (holding that the trial court erred by imposing sanctions under Chapter 9 of the Texas Civil Practice and Remedies Code because the claim for sanctions was based on Chapter 10 of the code and Texas Rule of Civil Procedure 13). However, there is no requirement for "detailed notice," and "[a]ll due process requires is notice of the trial court's intent to consider imposing sanctions and an opportunity to be heard." *Bres*, 217 S.W.3d at 514. We may uphold the sanction ruling if any of the grounds raised in the motion is supported by the record. *Mann v. Kendall Home Builders Constr. Partners I, Ltd.*, 464 S.W.3d 84, 93 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *see Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 74 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (explaining that where the party seeking sanctions asserted that the opposing party violated a discovery order in ten ways,

sanctions would be upheld if the record supported any of the alleged violations (citing *Am. Flood Research, Inc.*, 192 S.W.3d at 583.

The plaintiffs' motion to strike is more than seventy pages long, excluding exhibits, and specifies that the plaintiffs are seeking sanctions based on multiple instances of discovery abuse and the fabrication and destruction of evidence. The motion to strike details these allegations repetitively and exhaustively. After an independent review of the entire record, we conclude that relators were given adequate notice of the trial court's intention to consider sanctions and were given an adequate opportunity to respond. *See In re Bennett*, 960 S.W.2d at 40; *Bres*, 217 S.W.3d at 514–15. Accordingly, we overrule this sub-issue.

## F.   Appropriateness of Sanction

Relators allege that the sanction was disproportionate to any harm. This argument is based on the first of the two *TransAmerican* standards which requires that "a direct relationship must exist between the offensive conduct and the sanction imposed." *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917. "This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party" and it "also means that the sanction should be visited upon the offender." *Id.*; *see also Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992) (orig. proceeding) ("As we stated in *TransAmerican*, the sanction must be directed against the abuse and toward remedying the prejudice caused an innocent party."). "A sanction does not satisfy the *TransAmerican* standard if the other party is not prejudiced by the conduct at issue." *In re Montelongo*, 586 S.W.3d 513, 521 (Tex. App.—Houston [14th Dist.] 2019, orig. proceeding).

54

In terms of spoliation, prejudice is evaluated based on the spoliated evidence's relevancy to key issues in the case, whether the evidence would have been harmful to the spoliating party's case (or, conversely, helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used in its stead. *Petroleum Sols.*, 454 S.W.3d at 489; *Brookshire Bros.*, 438 S.W.3d at 21–22. A party's intentional destruction of evidence may, "[a]bsent evidence to the contrary," be sufficient by itself to support a finding that the spoliated evidence is both relevant and harmful to the spoliating party and conversely, negligent spoliation could not be enough to support such a finding without "some proof about what the destroyed evidence would show." *Brookshire Bros.*, 438 S.W.3d at 22. The trial court should consider all evidence bearing on the factors associated with evaluating prejudice to the nonspoliating party. *Id.*

Here, the trial court's February 19, 2019 order: (1) strikes relators' pleadings, including all defenses, counter-claims, and cross-claims; (2) grants a default judgment in favor of plaintiffs and against relators on all issues of liability; (3) requires a jury trial regarding the amount of plaintiffs' damages; and (4) states that "no issues with regard to liability, including proportionate responsibility, shall be submitted to the jury."

As we have previously stated, the record contains sufficient evidence for the trial court to conclude that the relators engaged in multiple instances of sanctionable conduct. *See Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 661–62 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("The trial court may consider everything that has occurred during the history of the litigation when determining how to sanction a party."); *Buck v. Estate of Buck*, 291 S.W.3d 46, 55–56 (Tex. App.—Corpus Christi–Edinburg

55

2009, no pet.) ("In determining whether to impose death penalty sanctions, the trial court is not limited to considering only the specific violation for which sanctions are finally imposed, but may consider everything that has occurred during the history of the litigation."). The evidence showed that the testimony from some of relators' witnesses (1) contained internal conflicts, (2) clashed with testimony offered by relators' other witnesses, and (3) directly contradicted the documentary evidence produced by relators. Some of relators' responses to discovery were affirmatively incorrect and some of these responses appear to have been designed to conceal the existence of SCADA and Schweitzer data. And relators possessed and used SCADA data in analyzing the events that occurred on October 26, 2016, yet they failed to preserve it for purposes of this litigation.

As fact finder, the trial court was entitled to assess the credibility of the testimony and determine what weight to give to it, and we may not interfere with the factfinder's resolution of conflicts in the evidence. *Johnson v. Nat'l Oilwell Varco, LP*, 574 S.W.3d 1, 13 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Hogg v. Lynch, Chappell & Alsup, P.C.*, 553 S.W.3d 55, 68 (Tex. App.—El Paso 2018, no pet.); *Alpert v. Crain, Caton, & James, P.C.*, 178 S.W.3d 398, 412 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Considering the conflicting evidence and the evolving nature of the testimony, the trial court could reasonably have concluded that relators failed to comply with their obligations under the rules of civil procedure. *See Response Time, Inc. v. Sterling Commerce (N. Am.), Inc.*, 95 S.W.3d 656, 661–62 (Tex. App.—Dallas 2002, no pet.) (upholding death penalty sanction in light of, inter alia, defendant's fabrication of evidence, false testimony, and obstructionist tactics to conceal wrongdoing); *Daniel v. Kelley Oil Corp.*, 981 S.W.2d

230, 235 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (upholding death penalty sanction in light of party's fabrication of evidence and noting that fabrication of evidence is a "third degree felony" and is an "act so destructive of the integrity of our judicial process [that it] deserves serious punishment"); *see also Hill v. Spracklen*, No. 05-17-00829-CV, 2018 WL 3387452, at *7 (Tex. App.—Dallas July 12, 2018, pet. denied) (mem. op.) ("At trial, Hill introduced documents he should have produced during the course of the case, but failed to do so despite having been repeatedly ordered to do so, and presented what appeared to be inconsistent forms of the contract Janet Spracklen supposedly signed.").

As explained here, the trial court had sufficient evidence before it to conclude that relators committed sanctionable actions. However, our concern in our analysis of this sub-issue has to do with the severity or excessiveness of the sanction imposed based on the record presented. In this regard, we conclude that the sanction order constituted an abuse of discretion for the following reasons.

First, as a threshold matter, the trial court's ruling fails to comply with Texas Supreme Court precedent regarding the severity of the sanction imposed. *See Paradigm Oil*, 372 S.W.3d at 187. In *Paradigm Oil*, the trial court entered a post-answer default against a defendant as a death penalty discovery sanction and also excluded the defendant from participation in the trial regarding the plaintiff's unliquidated damages. The Texas Supreme Court held that it was error to sanction a party after a default by refusing to allow them to participate in a damages trial. *See id.* In conducting its analysis, the court held:

> Although punishment may be a legitimate consequence of a discovery sanction, it cannot be excessive. *See Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex.1992) (listing securing compliance, deterrence, and punishment as legitimate purposes of discovery sanctions). Sanctions for

57

discovery abuse should not be dispensed as arbitrary monetary penalties unrelated to any harm. *Ford Motor Co. v. Tyson*, 943 S.W.2d 527, 534–35 (Tex. App.—Dallas 1997, orig. proceeding). When discussing excessiveness, we have said that "the punishment should fit the crime" and that the sanction "should be no more severe than necessary to satisfy its legitimate purposes." *TransAmerican*, 811 S.W.2d at 917; *see also PR Invs. and Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 480 (Tex. 2008); *In re SCI Tex. Funeral Servs., Inc.*, 236 S.W.3d 759, 761 (Tex. 2007) (per curiam). Moreover, discovery sanctions are primarily intended to remedy discovery abuse and should be tailored to serve their remedial purpose. It is not apparent that barring Paradigm's participation in the post-default damages phase of the case served any purpose other than punishment.

Compensatory damages awarded post-default should compensate the injured party for its loss, not penalize the wrongdoer or allow the plaintiff a windfall. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848–49 (Tex. 2000) (noting that the role of compensatory damages is to fairly compensate the plaintiff, not punish the defendant). And although punitive damages are intended to punish the wrongdoer, they nevertheless must bear some relationship to the liability-producing conduct. *See* TEX. CIV. PRAC. & REM. CODE § 41.011(a) (requiring factfinder to consider nature of the wrong, character of conduct involved, degree of culpability, and extent to which conduct offends public sense of justice in determining exemplary damages); *see also In the Matter of Gober*, 100 F.3d at 1205 (noting that conduct sufficient to warrant punitive damages is not regarded as admitted by default). Given this authority and the death penalty sanction that ended the liability litigation, the additional sanction of precluding Paradigm from the damages trial was excessive. Retamco might have been entitled to a lesser sanction, such as the additional costs and expenses caused by Paradigm's discovery abuse, but barring its participation in the damages trial was "more severe than necessary to satisfy its legitimate purposes." *TransAmerican*, 811 S.W.2d at 917.

*Paradigm Oil*, 372 S.W.3d at 187.

In this case, the plaintiffs seek up to $245,000,000 in damages based on their live pleading. Here, the trial court's sanction order would act as a windfall to the plaintiffs insofar as it consists of a default judgment as to liability but also encompasses a default judgment as to gross negligence and precludes the application of rules pertaining to proportionate responsibility. *See id.* The sanction award thus fails to "bear some relationship to the liability-producing conduct" and is effectively an arbitrary monetary

58

penalty unrelated to any harm. *See id.*; *Ford Motor Co. v. Tyson*, 943 S.W.2d 527, 534–35 (Tex. App.—Dallas 1997, orig. proceeding).

Second, the trial court sanctioned relators for cumulative abuse of the judicial process; however, according to the record, a significant part of the alleged sanctionable conduct cannot be attributed solely to relators. *See TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917. The trial court's sanction order states that the "false affidavit" filed by Russell was "[m]ost troubling," and concluded that even if relators were not aware of the error regarding the length of the tarp rod at the time the affidavit was filed, they were well aware of the falsity prior to hearings on the summary judgments in which the affidavit was involved, yet relators failed to amend it, withdraw it, or otherwise notify the court and parties of its inaccuracy. The court specifically found that relators "have failed to offer any credible explanation for either their submission of the false affidavit or their failure to withdraw it, despite ample evidence and knowledge that the affidavit was false."

However, Jensen testified that Russell obtained information about the length of the tarp rod from counsel for relators and "through no other source." Jensen testified that he did not realize that there was an error in Russell's affidavit until plaintiffs' counsel showed Russell a photograph of the tarp rod and trailer during his deposition and discussed the correct length of the rod. Russell's deposition was taken on September 28, 2018. Based on the timeline, counsel for relators was aware of the falsity in the affidavit prior to the hearings on the parties' motions for summary judgments and did nothing to correct the affidavit, despite the fact that the measurements pertaining to the trailer, tarp rod, and power line are pivotal in this case. We note that Russell agreed that the measurements were "important" to his opinion. It thus appears that the error in Russell's affidavit

59

originated with counsel, rather than relators, and counsel failed to correct the affidavit or motions for summary judgment to which it was attached.[12]

Further, counsel for relators had, but failed to produce, some of the repair records for the power line. One of relator's attorneys admitted that he believed that repair records were produced on September 22, 2017, but they were not actually produced until a paralegal from plaintiffs' attorneys contacted his office and requested the documents. Counsel for relators also produced the same set of repair records with two different sets of Bates numbers. Further, relators had produced some documentation to counsel, but counsel failed to recognize that it was SCADA data and failed to properly identify and produce it. Counsel also failed to timely and properly supplement discovery responses with witness identities and appropriate designations. We do not dispute the trial court's finding that relators "withheld material evidence and information from their counsel of record," but based on this record, all of the offensive conduct detailed in the trial court's sanction order cannot be attributable solely to the relators.

Third, we are not persuaded that it is fully apparent that no lesser sanctions would have sufficed to promote relators' compliance with the rules. *See Cire*, 134 S.W.3d at 840–41. Here, the trial court had previously imposed lesser sanctions in the form of an

---

[12] In determining whether the sanction has been visited upon the offender, the supreme court has instructed us:

> The trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both. This we recognize will not be an easy matter in many instances. On the one hand, a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules. On the other hand, a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation. The point is, the sanctions the trial court imposes must relate directly to the abuse found.

*TransAm. Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 919 (Tex. 1991) (orig. proceeding).

approximately $11,000 monetary penalty regarding the relators' depositions. The record reveals no other sanction order until the eve of trial. While the trial court repeatedly expressed its frustration with relators' discovery efforts, the record does not indicate that relators were effectively advised, during the pendency of the litigation and before trial was imminent, of a potential death penalty sanction. We note, in this regard, that the trial court possesses numerous tools to remedy abuse, including, inter alia, an order disallowing further discovery, an order granting a continuance for the appropriate handling of late-disclosed evidence, an award of costs and expenses, an order regarding deemed facts, an order limiting or excluding evidence, or a jury instruction. *See*, *e.g.*, TEX. R. CIV. P. 215.2(b); *Christus Health Gulf Coast*, 505 S.W.3d at 528; *Spohn Hosp.*, 104 S.W.3d at 881 n.2; *Chrysler Corp.*, 841 S.W.2d at 849. Here, the trial court's sanction order summarily concludes that other lesser sanctions would be inadequate, however, based on this record, it is not "fully apparent" that no other sanctions were appropriate. *See Cire*, 134 S.W.3d at 840–41. We note, in this regard, that the trial court faulted the relators for failing to offer alternative suggestions as to the appropriate penalty for their transgressions. We are unable to conclude that it was the relators' burden to identify a sanction for their alleged transgressions, or that any such procedure should factor into a determination regarding the appropriate sanction.

Fourth, and finally, although the trial court correctly refused to conduct the sanction hearing as a full-blown trial on the merits, it incorrectly refused to consider certain categories of evidence that are relevant to a determination regarding the imposition of sanctions. *See TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917; *Chrysler Corp.*, 841 S.W.2d at 849. For example, the record does not indicate whether the missing evidence—

61

including data from SCADA, the Schweitzer relay, and the sequence of events log—was cumulative of other competent evidence that might be used in its stead. And, relators' witnesses, including Corby White, Senior Engineer in the Transmission Design Department, and David Wheeler, Supervisor in System Protection Engineering, testified that there was no preceding event on the power line which caused it to sag and that it is scientifically impossible to sag out of clearance in the manner alleged by plaintiffs. While the trial court was not required to entertain a trial on the merits, it could not assess whether the sanctionable conduct prejudiced the plaintiffs without reviewing the totality of the evidence before it. Moreover, the trial court's scope of review failed to fully encompass relators' explanations for the events underlying the sanctions motion insofar as it excluded testimony regarding relators' practices and procedures for the preservation of evidence. And, the trial court's refusal to allow relators' witnesses to testify at the hearing, while not a due process violation based on our analysis here, is troubling when examined under fundamental fairness doctrines or the fair trial standard. *See In re Advanced Powder Sols., Inc.*, 496 S.W.3d 838, 851 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding); *In re Ten Hagen Excavating, Inc.*, 435 S.W.3d 859, 863 (Tex. App.—Dallas 2014, orig. proceeding).

Based on the foregoing, we agree with relators that the trial court erred in assessing death penalty sanctions. We sustain relator's issue pertaining to sanctions as stated here.

## V.    CONCLUSION

The Court, having examined and fully considered the petition for writ of mandamus, the response, and the reply, is of the opinion that relators have shown themselves entitled

62

to mandamus relief, in part, as stated here. Accordingly, we lift the stay previously imposed in this case. We conditionally grant the petition for writ of mandamus and we direct the trial court to withdraw its February 19, 2019 order granting death penalty sanctions and to conduct further proceedings in this case in accordance with this opinion. We express no opinion as to any sanction that might be imposed, if any, after further proceedings in this case. We deny all relief sought with regard to the issues pertaining to recusal. Our writ will issue only if the trial court fails to comply.

GINA M. BENAVIDES,
Justice

Delivered and filed the
16th day of April, 2020.